IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| HERAND ABCARIAN, M.D., F.A.C.S. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TIMOTHY MCDONALD, M.D., J.D., | ) | |
| PATRICIA KALE, WILLIAM H. | ) | |
| CHAMBERLIN, JR., M.D., | ) | |
| NIKKI CENTOMANI, STUART ALLEN, | ) | |
| BARBARA MCCOLGIN, CHRIS J. | ) | FILED: JULY 7, 2008 |
| MOLLET, ESQ., THOMAS R. | ) | 08CV3843 |
| BEARROWS, ESQ., CHRISTINE | ) | JUDGE DER-YEGHIAYAN |
| FLANINGAM, MICHAEL TRUCCO, ESQ. | ) | MAGISTRATE JUDGE NOLAN |
| and THE BOARD OF TRUSTEES OF THE | ) | JH |
| UNIVERSITY OF ILLINOIS, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AT LAW

Plaintiff Demands Trial by Jury.

## <u>INTRODUCTION</u>

This action is brought to obtain redress for the intentional and malicious actions of certain members of the staff of the University of Illinois and the University of Illinois Medical Center at Chicago who, acting under color of law, conspired to and did retaliate against Plaintiff, Herand Abcarian, M.D., F.A.C.S., for his exercise of his free speech rights in the form of public criticism of the policies and actions or inactions of certain members of the staff, as required of him as a part of his duties and responsibilities as a member of the Medical Service Plan Board of Directors. In retaliation therefore, these staff members, Defendants herein, conspired to and arranged for a meritless lawsuit alleging medical negligence to be prosecuted against Plaintiff, settled such case without his knowledge that such lawsuit had ever been filed, and then fraudulently reported to the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation and the National Practitioner Data Bank that a medical negligence case against Plaintiff had been settled, thereby causing him to incur considerable

expenses to reopen and terminate the fraudulent case against him, respond to investigative demands from the State of Illinois Division of Professional Regulation, the National Practitioner Data Bank and the State of Florida Department of Health, Division of Medical Quality Assurance questioning the status of his license, to suffer severe mental distress and anguish, and personal and professional embarrassment. Plaintiff hereby asserts the following claims against the Defendants in the above-entitled action:

(1)     VIOLATIONS OF 42 U.S.C. 1983: FREE SPEECH ON MATTERS OF PUBLIC CONCERN AND DUE PROCESS.

(2)     VIOLATIONS OF 42 U.S.C. 1983, RIGHT TO TRIAL BY JURY.

(3)     VIOLATIONS OF 42 U.S.C. 1983, EQUAL PROTECTION OF THE LAWS

(4)     VIOLATIONS OF 42 U.S.C. 1986, EQUAL PROTECTION OF THE LAWS

(5)     VIOLATION OF 42 U.S.C. 1981, EQUAL PROTECTION

(6)     EQUITABLE AND OTHER RELIEF FOR DR. ABCARIAN'S CONTINUING DAMAGES ARISING OUT OF DUE PROCESS AND EQUAL PROTECTION VIOLATIONS

(7)     SUPPLEMENTAL JURISDICTION: INTENTIONAL INFLICTION OF MENTAL DISTRESS

(8)     SUPPLEMENTAL JURISDICTION: ABUSE OF PROCESS

(9)     SUPPLEMENTAL JURISDICTION: LIBEL

## JURISDICTION

1.  Jurisdiction of this court arises under 28 U.S.C. secs 1331, 1337, 1343(a), and 1367(a); 42 U.S.C. secs. 1981, 1983, 1985, 1986, and 1988.

2.  Jurisdiction of this court for the pendent or supplemental claims is authorized by 28 U.S.C. sec 1367(a) and F.R.Civ.P. 18(a), and arises under the doctrine of pendent jurisdiction as set forth in *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966). See also: *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, (2006).

## PARTIES

3.   Herand Abcarian, M.D., FACS., is the Turi Josefsen Professor of Surgery and is Board Certified by the American Board of Surgery and the American Board of Colon and Rectal Surgery. Among his professional accomplishments, he has been the President of the Illinois State Surgical Society and the Chicago Surgical Society, and has served as the Executive Director of the American Board of Colon and Rectal Surgery.  He is also been the President of the American Society of Colon and Rectal Surgeons and the member of the Board of Directors of the American Board of Medical Specialties.  He has was also a founding member and a member of the Board of Governors of the Society of American Gastrointestinal Endoscopic Surgeons.  He has held academic appointments at four institutions, and has otherwise enjoyed an outstanding professional career.   He is licensed to practice medicine in the State of Illinois and in the State of Florida and is a citizen of the United States. He has been a member of the medical staff of the University of Illinois Medical Center at Chicago since 1972.  He has been President – Executive Committee of the Medical Staff, University of Illinois Chicago Medical Center, 2001-2003 and at all times material hereto was employed by and was the Head of the Department of Surgery, University of Illinois College of Medicine at Chicago, and Service Chief of the Department of Surgery of the University of Illinois Medical Center at Chicago located the Northern District of Illinois in the City of Chicago, County of Cook, State of Illinois and he is a resident of Cook County, Illinois. A copy of his curriculum vitae is attached hereto as Exhibit A.  Such curriculum vitae demonstrates that Dr. Abcarian is one of the foremost colo-rectal surgeons in the United States. Prior to the filing of the lawsuit in the Circuit Court of Cook County, Illinois, County Department, Law Division, styled as DAVID BEHZAD, as Special Administrator for the Estate of JOHN BEHZAD, deceased, Plaintiff, vs. HERAND ABCARIAN, M.D., Defendant, No. 06 L 006172, the fraudulent claim against Dr. Abcarian, no lawsuit alleging medical negligence had been prosecuted against him to settlement or judgment and his reputation and professional standing were unquestioned.

4.   Defendants are all natural persons and employees of the University of Illinois and they are sued in their individual capacity except for the Board of Trustees of The University of Illinois which is a public corporation sued in its official capacity.

5.  Defendant Timothy McDonald, M.D., J.D., is Associate Chief Medical Officer for Safety and Risk Management, University of Illinois Medical Center at Chicago (hereinafter UIMCC) and he holds the academic rank as Associate Professor, University of Illinois College of Medicine.

6.  Defendant Patricia Kale is Director, University Office of Risk Management, University of Illinois and is in charge, among other things, of the procurement and administration of insurance coverage for medical malpractice insurance for the medical staff at the UIMCC.

7.  Defendant William H. Chamberlin, Jr. M.D. is the Medical Director of UIMCC. Although he is licensed to practice medicine, he does not do so and instead gives his attention to administrative matters.  He does not list himself as board certified in any medical specialty in his Physician Profile with the Illinois Department of Financial and Professional Regulation. He supervises Timothy McDonald M.D. in all Risk Management and Safety related matters and is the official member of the UIMCC staff responsible for ultimate resolution of all complaints brought against members of the medical staff.  He is the chairman of the committee of UIMCC which approves settlements of medical negligence claims.

8.  Defendant Nikki Centomani is Director of Safety and Risk Management, UIMCC and is involved in risk management, insurance issues and claims as they relate to UIMCC.  She and Dr. Timothy McDonald have a close personal and working relationship.

9.  Defendant Stuart Allen is Claims Manager, Office of Claims Management, University of Illinois at Chicago and administers the claims function of the University of Illinois Self-Insurance Plan for General and Professional Liability as it relates to medical negligence claims. Among other things, he is responsible for the investigation, evaluation and management of medical malpractice claims and litigation involving the UIMCC and staff.

10.  Defendant Barbara McColgin, is a Claims Analyst, Claims Management Office, University of Illinois at Chicago and is involved in the investigation of claims of medical negligence.

11. Defendant Chris J. Mollet, Esq., is Associate University Counsel and supervises the operations of University of Illinois Self-Insurance Plan for General and Professional Liability, the captive insurer of UIMCC as well as the operations of the Claims Management functions as they relate to medical negligence claims.

12. Defendant Thomas R. Bearrows, Esq. is University Counsel and is the general legal officer of the Board of Trustees and the University and serves as legal adviser to the Board of Trustees. He supervises Chris J. Mollet and, among other things, has final responsibility for the University of Illinois Self-Insurance Plan for General and Professional Liability. He also recommends to the Board of Trustee of the University of Illinois the settlement of claims of medical negligence.

13. Defendant Christine Flaningam, is a Staff Secretary, University of Illinois Board of Trustees, and, upon information and belief, works, from time to time, under the supervision and direction of Thomas R. Bearrows and Patricia Kale.

14. Defendant Michael Trucco, Esq. is an attorney at law and, from time to time, is an employee of or retained counsel for the Board of Trustees of the University of Illinois. He is closely supervised and directed in his work by Chris J. Mollet and Thomas R. Bearrows.

15. Defendant, The University of Illinois is a public corporation, the formal corporate name of which is "The Board of Trustees of the University of Illinois." This corporation operates, among other functions, the University of Illinois College of Medicine and UIMCC.

## **FACTS**

16. The First Amendment to the United States Constitution provides as follows:

> "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

This Amendment protects the right of citizens, including public employees to speak out and further protects the right of public employees to speak out consistent with their employment duties.

17.  The Fifth Amendment to the United States Constitution provides as follows:

> "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be  subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in  any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

This Amendment protects the rights of citizens, including public employees from the deprivation of liberty and property interests without procedural and substantive Due Process of law.

18.  The Eighth Amendment to the United States Constitution provides as follows:

> "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury,  shall  be  otherwise re-examined in any Court of the United States, than according to the rules of the common law."

This Amendment protects the rights of citizens, including public employee, to trial on the merits of a claim made against such person and further protects such person's right to trial by jury.

19.  The Fourteenth Amendment to the United States Constitution makes the provisions of the Bill of Rights, including the First, Fifth, and Eighth Amendments applicable to the states including the State of Illinois and provides in part:

> "1. All persons born or naturalized in the United States, and subject to the  jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges   or   immunities   of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

This Amendment provides for the rights of citizens, including public employees, to Due Process and Equal Protection of the laws.

6

20.  The regulations of the Board of Trustees of the University of Illinois, adopted and referred to as "University of Illinois Statutes" contain a Non-discrimination Statement, adopted May 31, 2005  which was in full force and effect at all times material hereto, which provided:

> "The University of Illinois will not engage in discrimination or harassment against any person because of race, color, religion, national origin, ancestry, age, marital status, disability, sexual orientation including gender identity, unfavorable discharge from the military or status as a protected veteran and will comply with all federal and state nondiscrimination, equal opportunity and affirmative action laws, orders and regulations. This nondiscrimination policy applies to admissions, employment, access to and treatment in University programs and activities."

This statute reflects the clearly defined policy of the Board of Trustees of the University of Illinois and requires the Board of Trustees of the University of Illinois and all employees acting under color of law on behalf of the University to comply with all federal nondiscrimination laws including the Due Process and Equal Protection provisions of the First, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

21.  The University of Illinois College of Medicine at Chicago adopted a "Medical Service Plan" and By-Laws for such plan pursuant to 110 ILCS Section 330/5 which provided a manner in which professional fees would be charged and the manner in which such fees would be disbursed.  A complete copy of such Plan By-Laws is attached hereto as Exhibit B.

22. The By-Laws of the Medical Service Plan provide in Article I, Sections A, B and D for the attainment of the following goals:

A.  To provide an optimum setting in which faculty physicians can practice their clinical skills, thereby furthering the clinical educations programs of the College.

B.  To provide funds for the compensation and fringe benefits necessary to attract and retain College faculty of the highest caliber.

***

D.  To support clinical faculty practice and provide a forum for discussion of practice issues.

7

23.   Article VI Section A.1 of the By-Laws provides that all Clinical Department Heads are members of the Board of Directors of the Medical Service Plan.  Plaintiff Dr. Abcarian was at all times material a Clinical Department Head and accordingly, a member of the Board of Directors of the Medical Service Plan.

24.   Article VI Section B of the By-Laws provides that the Board of Directors "shall have the following authorities and responsibilities:

1.   To support clinical faculty practice and provide a forum for discussion of practice issues.

2.   To represent the clinical faculty and to advise the UIC Medical Center on development of health care delivery systems with joint risk-sharing capabilities.

3. To provide and approve, in conjunction with the UIC Medical Center, shared administration services, including planning, marketing, managed care, and other business functions.

4.   To represent the clinical faculty and advise the UIC Medical Center, shared administrative services, including planning, marketing, managed care, and other business functions.

***

7.   To assess departmental MSP accounts based on an annual budged approved by the Board of Directors to support the cost of shared group practice expenses and the cost of group practice development.

***

9.   To approve all MSP fee schedules."

25.  Article IV Section C, 3 of the By-Laws provides in part that:

8

"All expenses incurred by the University… in connection with activities which generate or are related to Professional fees…. shall be a liability of the General Account and payable therefrom before the payment of any other expenditures. Such expenses shall include, but not be limited to premiums for or contributions toward professional liability coverage… pursuant to the University Self Insurance Plan… "Faculty Base Salaries" as in Article V below and fringe benefits related thereto; legal fees incurred by the Office of University Counsel; and other consulting expenses."

26.  In view of the foregoing, part of Dr. Abcarian's responsibilities was to participate in decisions of the Board of Directors of the Medical Service Plan regarding fees charged for physician services at UIMCC, expenses payable from such fees and to advise the UIC Medical Center on development of health care delivery systems with joint risk-sharing capabilities.

27.  Over the last several years, Patricia Kale, Director, University Office of Risk Management has appeared before the Board of Directors of the Medical Service Plan for the purpose of advocating and obtaining payment of premiums for or contributions towards professional liability coverage for members of the Medical Service Plan. Such payments come from fees generated by the physicians who are members of the medical staff at UIMCC.  At a number of these meetings which have occurred over the past several years, Ms. Kale has sought ever increasing contributions from the professional fees collected by the physicians for payment of premiums for or contributions toward professional liability coverage.

28.  Plaintiff Dr. Abcarian, as a member of the Board of Directors of the MSP and in the exercise of his Free Speech on matters of public concern, has voiced his opposition to such increasing payments and demanded explanation of the reason for the rising costs for professional liability insurance when premiums for medical malpractice coverage in the State of Illinois to other physicians from private insurers, primarily the Illinois State Medical Society captive insurer, ISMIE Mutual Insurance Company, have been decreasing for such insurance coverage.  In addition, other private insurance companies are selling policies of professional liability insurance (medical malpractice policies) to physicians in the State of Illinois.  Whereas a number of years ago, during the so-called "malpractice crisis" commercial insurance companies were withdrawing from the Illinois marketplace, so that primarily only ISMIE Mutual Insurance Company was willing to write malpractice insurance policies in Illinois,  there are now

approximately a dozen commercial insurance companies selling medical malpractice insurance coverage in the State of Illinois.

29.     Dr. Abcarian has made repeated and vociferous objections in discharge of his responsibilities to the Medical Service Plan and in exercise of his rights to Free Speech on matters of public concern under the First Amendment to the demands for increased premiums for or contributions towards professional liability coverage for members of the Medical Service Plan.  As a result thereof, a number of heated personal confrontations took place between Dr. Abcarian and Patricia Kale over this issue at, among other places, meetings of the Board of Directors of the Medical Service Plan.

30.  In addition to the foregoing, Dr. Timothy McDonald, who works with Patricia Kale in regard to Risk Management issues, has voiced his opposition to Dr. Abcarian's position and his support for Patricia Kale.  In addition, a personal animosity existed on the part of Dr. Timothy McDonald toward Dr. Abcarian because Dr. Abcarian was instrumental in seeking to have him removed from the Operating Room Committee, a Committee of the Medical Staff of UIMCC responsible for the conduct of the operating room.  Dr. Abcarian advocated the removal of Dr. McDonald from the Operating Room Committee because of Dr. McDonald's disruptive effect upon meetings of the Committee.

31.  Additionally, Dr. Abcarian in the exercise of his Free Speech on matters of public concern, has had personal confrontations with Dr. McDonald over Risk Management and Safety issues including the issue of whether clinical privileges, including operating room privileges, should be suspended for physicians who are impaired by their abuse of prescription drugs.  Dr. McDonald has been indifferent to this issue which is an issue of substantial concern to Dr. Abcarian inasmuch as it directly relates to patients' safety.

32.  Further, Dr. Abcarian in the exercise of his Free Speech on matters of public concern, has had numerous confrontations with William H. Chamberlin, Jr. M.D., on issues of Risk Management, faculty recruitment, compensation and fringe benefits, and obstruction by the management of UIMCC to numerous needed changes and the timing of the implementation of

10

such changes and the allocation of costs to shared administrative expenses, including medical malpractice insurance premiums and reserves.

33.  Against this background of animosity on the part of Risk Management personnel towards Dr. Abcarian because of his objections to escalating costs assessed against the professional fees for insurance expenses and contributions and his concern about Risk Management and patients' Safety issues, the claim of David Behzad in relation to the death of his father, John Behzad provided a welcomed opportunity for Patricia Kale, Timothy McDonald, M.D. and William H. Chamberlin, Jr. M.D., operating under the color of law, to retaliate against Dr. Abcarian for his exercise of his rights to Free Speech and the discharge of his duties as a member of the Board of Directors of the MSP to support clinical faculty practice and provide a forum for discussion of practice issues and to represent the clinical faculty and to advise the UIC Medical Center on development of health care delivery systems with joint risk-sharing capabilities and on issues of shared administrative expenses.  John Behzad was an out-patient at UIMCC whom Dr. Abcarian had treated for a condition unrelated to his death.

34.  David Behzad is a convicted felon. At all times material hereto, he was also under indictment for drug and gun related felony charges.  As such, he was statutorily ineligible pursuant to Illinois law to serve as administrator of his father's estate; nevertheless, he procured his appointment as Administrator of his father's estate through means of a fraudulent affidavit in an Estate opened in the Probate Division of the Circuit Court of Cook County.  755 ILCS 5/9.1 of the Probate Act provides that in order to qualify as Administrator, a candidate must be a person who "has not been convicted of a felony." David Behzad was statutorily ineligible to serve as Administrator of his father's estate.

35.  On or about July 8, 2005, Kathleen T. Zellner as attorney for the family of John Behzad, sent a letter to Dr. Abcarian advising that she represented the family in a "potential wrongful death lawsuit against [Dr. Abcarian]."  Dr. Abcarian promptly forwarded that letter to William Chamberlin, M.D., Chief Medical Officer of UIMCC, who, on or before July 12, 2005, forwarded the letter to Nikki Centomani, Director of Safety and Risk Management UIMCC, to start the evaluation process.

36.  From that point forward, a conspiracy was undertaken by the various Defendants herein as more fully described hereinafter with the malicious intent and purpose of discrediting, embarrassing and humiliating Dr. Abcarian, damaging his professional reputation and causing him acute mental distress.  Upon information and belief, Nikki Centomani immediately brought the letter concerning Dr. Abcarian to the attention of Timothy McDonald, M.D.

37.  From that point forward, the conspiracy and plot to discredit Dr. Abcarian moved forward in secret. The details of the conspiracy are not known to Dr. Abcarian but upon information and belief William H. Chamberlin, Jr. M.D., Nikki Centomani, Timothy McDonald, M.D. and Patricia Kale and other defendants named herein conspired to bring about a settlement of a non-meritorious medical negligence claims against Dr. Abcarian so that such settlement could be reported to the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation and the National Practitioner Data Bank for the purpose of discrediting, embarrassing and humiliating Dr. Abcarian, damaging his professional reputation and causing him acute mental distress.

38.  At all times material hereto, Dr. Abcarian had a well recognized constitutionally protected right to his good name and professional reputation and the right to be free from the intentional infliction of mental distress.

39. The Illinois Department of Financial and Professional Regulation, Division of Professional Regulation has jurisdiction over a physician's license to practice medicine and can suspend or revoke a physician's license as a result of his negligence in the practice of medicine pursuant to 225 ILCS 60/22.

40.  The National Practitioner Data Bank is a data repository established under 42 U.S.C. Sec 11101 et seq. for, among other purposes, the reporting and dissemination of information regarding medical malpractice settlements, judgments and payments in relation to specific physicians.

41.  Upon information and belief, William H. Chamberlin, Jr. M.D., Nikki Centomani and Timothy McDonald, M.D., acting as conspirators in concert, directed Stuart Allen, Claims

12

Manager and Barbara McColgin, Claims Analyst from the Claims Management Office of the University of Illinois Self-Insurance Plan for General and Professional Liability to omit from all evaluation reports of the Behzad claim any information which would exculpate or tend to exculpate Dr. Abcarian from liability for malpractice and they did so.

42. Prior to June 13, 2006 no lawsuit had been filed against Dr. Abcarian in connection with the medical negligence claim on behalf of the Estate of John J. Behzad.

43. Upon information and belief, the committee which considered settlement of medical negligence claims against physician staff members of UIMCC consisted of William H. Chamberlin, Jr., M.D., Chairman, Timothy McDonald, M.D., Patricia Kale, Nikki Centomani, Stuart Allen, Barbara McColgin and Chris J. Mollet. Upon information and belief such committee consisting of those members met and recommended to The Board of Trustees of the University of Illinois settlement of the Behzad claim.

44. Prior to June 13, 2006 upon information and belief, the Defendants herein with the exception of Michael Trucco, also recommended and agreed to a payment of $950,000.00 to "David Behzad, Individually and as Independent Administrator of the Estate of John J. Behzad, Deceased," in settlement of all claims against "The Board of Trustees of the University of Illinois, it employees, agents, servants, and students, their heirs, executors, administrators and assigns, of and from any and all actions, claims, demands, damages, costs, expenses and compensation on account of, or in any way growing out of injuries claimed to have been sustained on or about June 7, 2003 through and including February 4, 2005."

45. The terms of the settlement aforesaid were incorporated in a Release and Indemnity Agreement which David Behzad executed on June 13, 2006 and which contained the foregoing language and which also provided: "this is a full and complete release for all injuries and damages which the undersigned claims to have sustained or will sustain by reason of the above, whether said damages are now known or hereafter become known, including all present damages and all future developments therefrom." A copy of such Release is attached hereto as Exhibit C.

46.  Upon information and belief, at the direction of Stuart Allen or Barbara McColgin or some other unknown conspirator, in furtherance of the conspiracy, on June 13, 2006, Kathleen Zellner filed a lawsuit styled as DAVID BEHZAD, as Special Administrator for the Estate of JOHN BEHZAD, deceased, Plaintiff, vs. HERAND ABCARIAN, M.D., Defendant, No. 06 L 006172.

47.  Upon information and belief, Ms. Zellner was directed by Stuart Allen or Barbara McColgin or some other unknown conspirator, to file such lawsuit even though there had been a complete resolution of all claims of medical negligence relating to John J. Behzad.  The lawsuit was filed in furtherance of the conspiracy to discredit Dr. Abcarian and for the purpose of obtaining an unfavorable judicial resolution of a medical negligence claim against Dr. Abcarian for the purpose of using the resolution of the lawsuit for the purpose of discrediting, embarrassing and humiliating Dr. Abcarian, damaging his professional reputation and causing him acute mental distress.

48.  In prosecuting the lawsuit, David Behzad obtained an order appointing him Special Administrator of the Estate of John Behzad.  The Illinois Wrongful Death Act provides in part at 740 ILCS 180/2.1 that the court may appoint a special administrator to conduct a wrongful death action where the cause of action is the sole asset of the estate "*and no petition for letters of office for his or her estate has been filed."*  Because a Petition for Administration of the Estate of John Behzad had already been filed, the appointment of David Behzad as Special Administrator was void and the lawsuit was a nullity.

49.  Upon information and belief, Ms. Zellner was directed not to have a summons issued and not to obtain service of process upon Dr. Abcarian but instead was directed by Stuart Allen or Barbara McColgin or some other unknown conspirators to represent to the trial court that the case had been settled and to obtain an order of dismissal with prejudice of the claim against Dr. Abcarian.

50.  The intent of the Defendant conspirators in obtaining the order of dismissal with prejudice was to foreclose Dr. Abcarian's rights to Due Process to contest the claim and for the purpose of discrediting, embarrassing and humiliating Dr. Abcarian, damaging his professional reputation and causing him acute mental distress.

51.  On July 6, 2006, Ms. Zellner, without notice to or the knowledge of Dr. Abcarian that any case had ever been filed or that any settlement had ever been agreed to, upon information and belief, acting at the direction of Stuart Allen or Barbara McColgin or some other unknown conspirator, in furtherance of the conspiracy, obtained an order of court which approved the settlement of the case and dismissed the case with prejudice, thereby foreclosing Dr. Abcarain's right to contest the merits of the claim made against him.  Dr. Abcarian did not become aware of the dismissal order for more than 30 days after its entry and such order became a final order 30 days after entry.

52.  In fact, because all potential claims arising out of the death of John J. Behzad had been settled prior to the filing of the lawsuit, the lawsuit was a fraud and a sham perpetrated at the instance and direction of Stuart Allen or Barbara McColgin or Nikki Centomani or Timothy McDonald, M.D., or William H. Chamberlin, Jr., M.D., or some other unknown conspirators for the purpose of discrediting, embarrassing and humiliating Dr. Abcarian, damaging his professional reputation and causing him acute mental distress.

53.  On July 13, 2006, Thomas R. Bearrows, University Counsel, recommended to the Board of Trustees the approval of the settlement of the claim on behalf of John J. Behzad in the sum of $950,000.00 and the Board approved such settlement. This act also furthered the conspiracy.

54.  Contemporaneously with actions of the conspirators to induce the filing of the lawsuit against Dr. Abcarian and its dismissal with prejudice without his knowledge, a true case of medical malpractice occurred at UIMCC involving a bowel perforation during a surgical procedure ultimately leading to the death of Julius Izquierdo.  Mr. Izquierdo died on June 28, 2006.  Dr. Abcarian was not involved in the treatment of this patient.

55.  On September 7, 2006 Thomas R. Bearrows, University Counsel recommended to the Board of Trustees, of which he is an officer, approval of the settlement of that case in the amount of $6,750,000.00.  No lawsuit making a claim on behalf of the Estate of Julius Izquierdo had been filed and no person acting on behalf of the University of Illinois required a lawsuit to be filed in connection with this case to provide a basis for its settlement or for any other reason.  The

settlement of this case was approved by an order of the Probate Division of the Circuit Court of Cook County, Illinois without a lawsuit ever having been filed.

56.   Although 42 U.S.C. sec. 11131 required that the settlement of the Izquierdo claim be reported to the National Practitioner Data Bank by the Trustees of the University of Illinois or the University of Illinois Liability Self-Insurance Plan, or UIMCC, no such report was ever made.

57.   Upon information and belief, the surgeon responsible for the death of Julius Izquierdo was allowed to resign his position at UIMCC and from the faculty of the University of Illinois College of Medicine without being reported to the National Practitioner Data Bank, contrary to law, even though, upon information and belief, the investigation of his conduct revealed medical negligence leading to the death of Julius Izquierdo and other wrongdoing and misconduct by the surgeon.

58.   42 U.S.C. sec. 11133 requires that "a health care facility which accepts the surrender of clinical privileges of a physician (i) while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct or (ii) in return for not conducting such an investigation or proceeding" report such occurrence and the physician involved to the National Practitioner Data Bank.  Upon information and belief, no such report was ever made.

59.   Upon information and belief, Timothy McDonald, M.D. and William H. Chamberlin, Jr., M.D., were the persons who arranged for the resignation of the surgeon responsible for the death of Julius Izquierdo in exchange for not reporting the surgeon to the National Practitioner Data Bank.

60.  Upon information and belief, on July 27, 2006 Timothy McDonald, M.D., with the concurrence and assistance of William H. Chamberlin, Jr., M.D., in furtherance of the conspiracy, appeared as guests before the Executive Committee of the Medical Service Plan Board of Directors and presented "malpractice cases to be considered for the National Practitioner Data Bank."  Dr. Abcarian was excused from that portion of the meeting of the

16

Executive Committee on July 27, 2006. The cases presented by Timothy McDonald, M.D. and William H. Chamberlin, Jr., M.D. for consideration for reporting or not reporting to the National Practitioner Data Bank were the Behzad case and the Izquierdo case.

61. It was not a function of the Executive Committee to review or approve malpractice cases to be considered for reporting to the National Practitioner Data Bank. No such function is specified in the By-Laws of the Medical Service Plan. In the seventeen years Dr. Abcarian has been a member of the Board of Directors of the MSP, the By-Laws have never provided a malpractice case review function for the MSP.

62. Upon information and belief, the appearance of Timothy McDonald, M.D. and William H. Chamberlin, Jr., M.D., before the Executive Committee was with the intent and purpose of securing the approval of the Executive Committee to report Dr. Abcarian to the National Practitioner Data Bank and not to report the other surgeon responsible for the death of Julius Izquierdo.

63. The Executive Committee of the MSP took no action in regard to such cases as reported by Timothy McDonald, M.D. The appearance of Timothy McDonald M.D. and William H. Chamberlin, Jr., M.D., before the Executive Committee on July 27, 2006, to the best of Dr. Abcarian's knowledge, is the only appearance ever made by anyone to attempt to secure approval of the MSP for the reporting of a physician to the National Practitioner Data Bank.

64. Despite the refusal of the Executive Committee of the MSP to approve the reporting of Dr. Abcarian to the National Practitioner Data Bank, nevertheless, upon information and belief, and in furtherance of the conspiracy by the Defendants herein, except Michael Trucco, to discredit Dr. Abcarian, on August 2, 2006 Christine Flaningam, staff secretary, University of Illinois Board of Trustees, a Defendant herein, upon information and belief acting pursuant to the directions of Thomas R. Bearrows or Patricia Kale or Timothy McDonald, M.D. or William H. Chamberlin, Jr., M.D., or some or all of them, falsely and acting knowingly, intentionally, with actual malice and malice and in bad faith, reported to the National Practitioner Data Bank that a settlement of a medical negligence claim had been made on behalf of Herand Abcarian, M.D. in the amount of $950,000.00 as the result of a failure to perform a colonoscopy. Such report was

wholly false and fraudulent because no settlement of any such medical negligence claim was made by or on behalf of Dr. Abcarian and because Dr. Abcarian did not fail to perform a colonoscopy. Additionally, the medical treatment of John Behzad by Herand Abcarian, M.D. did not result in Behzad's death.

65. Upon information and belief, in furtherance of the conspiracy by the Defendants, except Michael Trucco, to discredit Dr. Abcarian, on August 11, 2006 Patricia Kale, Director of the University Office of Risk Management and a Defendant herein, at the direction of and in conspiracy with Timothy McDonald, M.D., William H. Chamberlin, Jr., M.D., and Thomas R. Bearrows falsely and acting knowingly, intentionally, with actual malice and malice and in bad faith, reported to the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation that a settlement of a medical negligence claim had been made on behalf of Herand Abcarian, M.D. in the amount of $950,000.00 as the result of a failure to timely diagnose cancer and that this resulted in the death of John Behzad. Such report was wholly false and fraudulent because no settlement of any such medical negligence claim was made by or on behalf of Dr. Abcarian. Additionally, the medical treatment of John Behzad by Herand Abcarian, M.D. did not result in Behzad's death.

66. Upon information and belief, it is the custom and practice of The Board of Trustees of the University of Illinois and UIMCC not to report to the Illinois Department of Financial and Professional Regulation or to the National Practitioner Data Bank the settlement of malpractice claims arising or allegedly arising out of the errors and omissions committed by physicians on the medical staff of UIMCC and that settlement of such cases is made by and in the name of the Board of Trustees of the University of Illinois so as to obviate the necessity of such reporting.

67. Although Dr. Abcarian requested from Defendant Patricia Kale and Jennie Fontaine, Public Information Officer of UIMCC on or about March 17, 2007 information regarding settlement of other cases of alleged medical negligence and the reporting thereof by means of a Freedom of Information Act request pursuant to 5 ILCS 140/1 et. seq., the Illinois Freedom of Information Act, such request was denied. Dr. Abcarian's counsel appealed the denial of the requested to The Board of Trustees of the University of Illinois on or about May 2, 2007. A copy of such

request, which was also sent to the Chairman of the Board of Trustees and the Chairman of the Legal Affairs Committee of the Board of Trustees, is attached hereto as Exhibit D.   The President of the Board of Trustees denied such appeal.

68.  By means of the letter of May 2, 2007, The Board of Trustees of the University of Illinois was made fully aware of the nature and extent of the conspiracy to discredit Dr. Abcarian and to falsely report him to the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation and the National Practitioner Data Bank.  In the event that The Board of Trustees of the University of Illinois previously had been unaware of the nature and extent of the conspiracy, it became fully cognizant of the conspiracy but took no action to halt it, thereby adopting the actions of the conspirators as the official policy of the Board of Trustees.

69.  Based upon the denial of the requested information as to the reporting or non-reporting of other settlements of alleged medical negligence cases, Dr. Abcarian has reason to believe that the false report of the settlement of the claim against him is the only occasion when The Board of Trustees of the University of Illinois has reported the alleged settlement of a claim of medical negligence to the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation or the National Practitioner Data  Bank.  Accordingly, the treatment of him by The Board of Trustees of the University of Illinois is grossly disparate and unequal, particularly considering the report of the alleged settlement of his case was false and fraudulent and, by way of example, upon information and belief, the actions of the surgeon involved in the death of Julius Izquierdo should have been reported to the Illinois Department of Financial and Professional Regulation and the National Practitioner Data Bank but were not.

70.  On or about August 3, 2006, the National Practitioner Data Bank sent correspondence to Dr. Abcarian advising him that action had been taken against him and demanding that he provide a response to the report that a settlement of a medical malpractice case had been made on his behalf.

71.  Upon information and belief, the reports contained in the National Practitioner Data Bank concerning settlements on behalf of physicians are accessible at least to state licensing boards, to hospitals, and to other health care entities (including health maintenance organizations) that have

entered (or may be entering) into an employment or affiliation relationship with the physician or practitioner or to which the physician or practitioner has applied for clinical privileges or appointment to the medical staff for an indefinite period of time and until modified or removed.

72.  In view of the foregoing, in the event that Dr. Abcarian ever applies for employment or staff privileges at any health care institution, the false report of the settlement of the Behzad claim will be available to any health care institution for examination.  This will result in further acute embarrassment to Dr. Abcarian and the potential declination by such health care facility to grant privileges or to employ Dr. Abcarian. Dr. Abcarian has been requested to seek staff privileges at another hospital in Cook County, Illinois and is currently planning to do so.

73.  On or about August 16, 2006, the Medical Disciplinary Board of the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation sent correspondence to Herand Abcarian, M.D. advising him that under Illinois law:

> 1) You **must** send a written statement explaining the facts and circumstances, which led to the filing of this reports.
>
> 2)  **Failure** to respond in writing within 60 days (no extensions) constitutes a violation of the Medical Practice Act and can result in a **fine and/or disciplinary action** against your license.

74.  Upon receipt of the letters from the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation Medical Disciplinary Board and the National Practitioner Data Bank, Dr. Abcarian engaged counsel on his behalf to investigate the claims being made against him.

75.  At that time, he had no knowledge that any lawsuit had ever been filed against him on behalf of the Estate of John Behzad.

76.  The ensuing investigation revealed the existence of a lawsuit in the Circuit Court of Cook County, Illinois, County Department, Law Division, styled as DAVID BEHZAD, as Special Administrator for the Estate of JOHN BEHZAD, deceased, Plaintiff, vs. HERAND

ABCARIAN, M.D., Defendant, No. 06 L 006172.  The investigation further revealed that no summons had ever been placed for service and that no appearance had ever been filed on behalf of Dr. Abcarian.  Additionally, the lawsuit revealed the existence of the order of July 6, 2006 dismissing the lawsuit with prejudice.  All of these facts were unknown to Dr. Abcarian prior to this investigation.

77.  Dr. Abcarian suffered and suffers acute mental distress, embarrassment and humiliation by reasons of the lawsuit filed against him and the false reports of settlement made to the National Practitioner Data Bank and the Illinois Department of Financial and Professional Regulation.  He was acutely embarrassed by having to ask a professional peer to review the sham case brought against him and to provide his opinion as to whether Dr. Abcarian committed medical negligence.  Dr. Abcarian continuously fears that the false reports about him could be resurrected at some future time, particularly when he might apply for medical staff privileges at another health care institution, further invading his privacy and damaging his otherwise excellent reputation.  He has lost considerable sleep and incurred great worry and mental anguish as a result of these false reports and filings.

78. After receipt of the letters from the Illinois Department of Financial and Professional Regulation and the National Practitioner Data Bank and after learning of the existence of the Behzad lawsuit, Dr. Abcarian then reported these facts to Truman Anderson, M.D., Vice-Dean of the University of Illinois College of Medicine who also had no knowledge of the foregoing. Dr. Anderson arranged for a meeting among Dr. Abcarian, his counsel, Dr. Anderson, Chris J. Mollet and Stuart Allen to determine if mistakes had been made, how the lawsuit came about, how the lawsuit had been settled if indeed such had occurred and how to correct the record both in the Circuit Court of Cook County and with the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation, Medical Disciplinary Board and the National Practitioner Data Bank.

79.  A meeting took place on October 9, 2006 involving Dr. Abcarian, his counsel, Dr. Anderson, Chris J. Mollet and Stuart Allen as arranged by Dr. Anderson.  Although requested by Dr. Abcarian's counsel, Christ J. Mollet refused to take any action to correct the record in the

21

Circuit Court of Cook County, Illinois or with the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation Medical Disciplinary Board and the National Practitioner Data Bank.  If Chris J. Mollet had no prior knowledge of the conspiracy to discredit Dr. Abcarian, he joined in and subscribed to the conspiracy at that time by refusing to intervene to stop the misconduct.

80.  On or about October 12, 2006, Dr. Abcarian's counsel filed a Petition to Vacate the Order of July 6, 2006 Pursuant to 735 ILCS 2-1401(f) in order to have the opportunity to contest the merits of the claim which was made against him.  The Petition asked that the order of dismissal with prejudice be vacated, that the settlement be vacated, that the settlement funds be returned to the Board of Trustees of the University of Illinois and that Dr. Abcarian have his due process rights to contest the claim made against him.  At the time of the filing of the Petition to Vacate, Dr. Abcarian was unaware that the terms of the settlement agreement and release had fully released all claims in connection with the death of John Behzad prior to the filing of the lawsuit against Dr. Abcarian.

81.  In support of said Petition to Vacate, Dr. Abcarian filed the Affidavit of David Schoetz, M.D., an independent physician exceedingly well qualified in the field of colo-rectal surgery attesting to the lack of merit of the claim which had been made on behalf of the Estate of John Behzad. Dr. Schoetz was and is a professional peer of Dr. Abcarian and Dr. Abcarian was embarrassed professionally in soliciting his opinion of Dr. Abcarian's conduct.

82.  On or about October 14, 2006, Dr. Abcarian's counsel informed the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation, Enforcement Administration Unit that the report of the resolution of the Behzad case had been improperly made and that Dr. Abcarian was in the process of seeking to have the case reopened so that he could defend himself.

83.  Subsequent thereto, on October 17, 2006, Dr. Abcarian's counsel made formal demand upon Chris J. Mollet and the Trustees of the University of Illinois to correct the record in the Circuit Court of Cook County, Illinois, and to rectify the false and improper reports to Illinois

Department of Financial and Professional Regulation, Division of Professional Regulation Medical Disciplinary Board and the National Practitioner Data Bank.

84. Dr. Abcarian's counsel also demanded that the University of Illinois Self-Insurance Plan pay the legal expenses Dr. Abcarian incurred in his efforts to correct the record, have the judgment vacated and have the reports to Illinois Department of Financial and Professional Regulation, Division of Professional Regulation Medical Disciplinary Board and the National Practitioner Data Bank withdrawn. Such request for reimbursement was fully justified by Illinois case law regarding irreconcilable conflicts of interest between insurers and insured and the fiduciary duties of insurers.

85. In response thereto, in furtherance of the conspiracy, Chris J. Mollet, and, upon information and belief, Thomas R. Bearrows acting under color of law on behalf of The Board of Trustees of the University of Illinois, engaged the services of Michael Trucco to resist any attempt by Dr. Abcarian to reopen the lawsuit in the Circuit Court of Cook County and defend the claim made against him. By such action supporting the conduct of the conspirators, Chris J. Mollet and Thomas R. Bearrows and The Board of Trustees of the University of Illinois, if they had not previously been conspirators, ratified the wrongful conduct aforesaid and joined in and fully endorsed all the goals of the conspiracy to embarrass and discredit Dr. Abcarian and to cause him intentional and acute mental distress and to cause him to incur substantial expense in responding to investigations of his license and status to practice medicine, including the expense of the legal effort to clear the record in the Circuit Court of Cook County, Illinois.

86. On or about February 21, 2007, after contacting the National Practitioner Data Bank and advising the Bank of the true facts related to the false report of a settlement on Dr. Abcarian's behalf, Dr. Abcarian wrote to Christine Flaningam and advised her that the National Practitioner Data Bank had instructed him that "Any corrections or modifications to a report maintained by the Data Banks must be submitted by the entity that submitted the report." Dr. Abcarian demanded that Christine Flaningam withdraw the report but she, in furtherance of the conspiracy, failed or refused to do so.

87.  On or about February 21, 2007, Dr. Abcarian wrote to Patricia Kale and stated the following:

> " Demand is hereby made upon you that you advise the Illinois Department of Financial and Professional Regulation that the settlement of the case was made without my knowledge, authorization, approval or consent, that the settlement was erroneous and that you now regard the claim to be without merit.  I am unable to correct the damage that you have done to my reputation with your report of because the corrective request must come from you."

Patricia Kale, in furtherance of the conspiracy, failed or refused to so advise the Illinois Department of Financial and Professional Regulation.

88.  On or about March 15, 2007, Michael Trucco acting in furtherance of the conspiracy and under the direction and control of Chris J. Mollet and Thomas R. Bearrows filed a Petition to Intervene on behalf of the Board of Trustees of the University of Illinois and a Motion to Dismiss Dr. Abcarian's Petition to Vacate the Order of July 6, 2006, thereby attempting to foreclose Dr. Abcarian's right to reopen the Behzad lawsuit and obtain his Due Process right to trial by jury on the issues.

89.  All though the Estate of John Behzad was properly served with Dr. Abcarian's Petition to Vacate and although Kathleen Zellner, the attorney for the Estate, was ordered to appear and respond to the Petition, and she did appear, she never contested the affidavit of Dr. David Schoetz which had established the lack of merits of the claim made on behalf of the Estate of John Behzad.  Accordingly, by default, David Behzad admitted that the claim which he had prosecuted was without merit.

90.  During the pendency of the Petition to Vacate, Dr. Abcarain's counsel made an offer The Board of Trustees through Michael Trucco to withdraw that portion of Dr. Abcarian's Petition to Vacate which sought the return of the $950,000.00 settlement funds to the Board of Trustees of the University of Illinois, provided that the Board of Trustees of the University of Illinois agree to the waiver of such claim for return of the funds and further agree not to contest the Petition to Vacate.

91.  The Board of Trustees of the University of Illinois acting through Michael Trucco and apparently with the knowledge, consent and approval of Thomas R. Bearrows, and in furtherance

24

of the conspiracy, refused Dr. Abcarian's offer, thereby reiterating its purpose of damaging Dr. Abcarian's professional reputation and intentionally causing him acute mental distress.

92.  Michael Trucco and the Board of Trustees of the University of Illinois upon information and belief, acting with the knowledge, consent and approval of Thomas R. Bearrows, in furtherance of the conspiracy, vigorously sought to intervene in Dr. Abcarian's Petition to Vacate and sought the dismissal of the Petition to Vacate, thereby attempting forever to foreclose Dr. Abcarian of the exercise of his right to Due Process and a trial by jury.   This action was purposeful, intentional and malicious and in bad faith and done for the express purpose of inflicting additional harm upon  Dr. Abcarian.

93.  On April 18, 2007, the Circuit Court of Cook County, Illinois, over the strenuous objection of Michael Trucco on behalf of the Board of Trustees of the University of Illinois, entered an order which vacated the order dismissing the Behzad case with prejudice.   Kathleen Zellner, counsel for the Estate of John Behzad then immediately orally moved for leave to dismiss the case with prejudice to any right of the Estate to re-file the case and the court granted such motion on April 18, 2007.   Accordingly, there was no possibility of an adverse judgment ever being entered against Dr. Abcarian because the record established that the claim against Dr. Abcarian was permanently abandoned by the Plaintiff and could not be reinstated

94.   On or about April 18, 2007 Plaintiff wrote to Christine Flaningam, staff secretary, University of Illinois Board of Trustees, a Defendant herein, and provided her with a copy of the order of the Circuit Court of Cook County, Illinois of April 18, 2007 which vacated the order dismissing the case with prejudice and dismissed the case with prejudice upon motion of Kathleen Zellner, counsel for David Behzad, thereby precluding an adverse judgment from ever being entered against Dr. Abcarian.  Dr. Abcarian wrote:

> " … demand is made upon you to advise the National Practitioner Data Bank that the report you made about a case against me being settled was erroneous and that there is no settlement of a case against me. Further, demand is made upon you that you advise the National Practitioner Data Bank."

95.  Upon information and belief, in furtherance of the conspiracy to discredit Dr. Abcarian and intentionally and maliciously to cause him acute mental anguish, and acting pursuant to the

25

directions of Thomas R. Bearrows or Patricia Kale or Timothy McDonald, M.D. or William H. Chamberlin, Jr., M.D., or some or all of them to falsely report to the National Practitioner Data Bank that a settlement of a medical negligence claim had been made on behalf of Herand Abcarian, M.D. in the amount of $950,000.00, Christine Flaningam intentionally and maliciously failed or refused to so advise the National Practitioner Data Bank with the intent to further the purposes of the conspiracy and to inflict mental distress upon Dr. Abcarian and to cause him to continue to incur substantial legal expense to repair his damaged reputation.

96.  To the best of Dr. Abcarian's knowledge, the false report submitted by Christine Flaningam remains of record with the National Practitioner Data Bank and is uncorrected.  The continued existence and effect of such false report is reflected in a demand from the State of Florida Department of Health, Division of Medical Quality Assurance on March 20, 2008 for an explanation of why a medical negligence case had been filed and settled against Dr. Abcarian and why he had not reported it to the State of Florida Department of Health, Division of Medical Quality Assurance.

97.  Dr. Abcarian was obligated to and did incur legal expense in responding to the demand from the State of Florida Department of Health, Division of Medical Quality Assurance. Dr. Abcarian accordingly continues to suffer acute mental distress intentionally inflicted through the actions of Defendants herein.

98.  Because there has been no resolution of these false and fraudulent reports, and because the persons responsible for making the reports refuse to rescind them, Dr. Abcarian has ongoing acute mental distress concerning the status of his license to practice medicine and earn a livelihood and continues to be exposed to legal expense in connection with these false reports.

99.  On or about April 18, 2007 Plaintiff wrote to Patricia Kale, Director, University Office of Risk Management, University of Illinois, a Defendant herein, and provided her with a copy of the order of the Circuit Court of Cook County, Illinois of April 18, 2007 which vacated the order dismissing the case with prejudice and dismissed the case with prejudice upon motion of Kathleen Zellner, counsel for David Behzad, thereby precluding an adverse judgment from ever being entered against Dr. Abcarian.  Dr. Abcarian wrote:

"… demand is made upon you to advise the Illinois Department of Financial and Professional Regulation that the report you made about a case against me being settled was erroneous and that there is no settlement of a case against me. Further, demand is made upon you that you advise the Illinois Department of Financial and Professional Regulation to remove the report of settlement from its records."

100.  Upon information and belief, in furtherance of the conspiracy to discredit Dr. Abcarian and to cause him acute mental anguish, and acting pursuant to the directions of Thomas R. Bearrows or Timothy McDonald, M.D. or some or both of them to falsely report to the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation that a settlement of a medical negligence claim had been made on behalf of Herand Abcarian, M.D. in the amount of  $950,000.00, Patricia Kale intentionally and maliciously failed or refused to so advise the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation with the intent to further the purposes of the conspiracy and to inflict mental distress upon Dr. Abcarian and to cause him to continue to incur substantial legal expense to repair his damaged reputation.

101.  To the best of Dr. Abcarian's knowledge, the false report submitted by Patricia Kale, remains of record with the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation and is uncorrected.

102.  Since Dr. Abcarian is not the originator of the reports to the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation and the National Practitioner Data Bank, he is without the ability to have the reports rescinded or even to know of the continued status of such reports.  He is accordingly without a remedy at law and is in need of an order of this court upon the Board of Trustees of the University of Illinois to rescind and withdraw and correct such false reports.

103.  Dr. Abcarian has been and continues to be irreparably harmed by the actions of the Defendants aforesaid. The refusal of Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq. and The Board Of Trustees of The University of Illinois to withdraw the false reports and to explain the

false basis for the reporting to the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation and the National Practitioner Data Bank constitute on-going, continual, intentional, bad faith, malicious acts knowingly perpetrated with actual malice for the specific purpose of causing Dr. Abcarian acute mental anguish, damage his reputation and cause him to be required to continue to spend considerable sums to attempt to restore his good name and reputation.   The on-going refusal to withdraw the false reports are acts by Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board Of Trustees of The University of Illinois in furtherance of the conspiracy to harm Dr. Abcarian.

## COUNT I
## VIOLATIONS OF 42 U.S.C. 1983: FREE SPEECH ON MATTERS OF PUBLIC CONCERN
## AND DUE PROCESS

104.  Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 103 above with the same force and effect as if set forth here at in full.

105.   At all times materials hereto, the conduct of all Defendants was subject to 42 U.S.C. Section 1983 and the Defendants were acting under color of law.

106.  At all times material, Dr. Abcarian had a clearly established right to Free Speech under the First Amendment to the United States Constitution and a duty pursuant to the terms of his membership on the Board of Directors of the Medical Service Plan to speak out on the matters of public concern regarding issues concerning payment of premiums for or contributions towards professional liability coverage for members of the Medical Service Plan and his concern about Risk Management and patients' Safety issues as well as physician discipline, faculty compensation and fringe benefits, and obstruction by the management of UIMCC to numerous needed changes and the timing of the implementation of such changes and the allocation of costs to shared administrative expenses, including medical malpractice insurance premiums and reserves.

28

107.   At all times material, Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board Of Trustees of The University of Illinois had a duty to refrain from retaliating against Dr. Abcarian for his exercise of his rights to Free Speech.

108.   Clearly established principles of case law rendered such conduct as hereinabove described in retaliating against Dr. Abcarian unconstitutional and accordingly, Defendants' conduct in retaliating as aforesaid was not objectively reasonable.  Dr. Abcarian's rights were not vague and amorphous but rather of a fundamental nature and the contours of the rights were sufficiently clear that a reasonable person would understand that what they were doing violated Dr. Abcarian's rights.

109.   In addition, at all times material, Dr. Abcarian had a clearly established, most fundamental procedural Due Process rights to notice and the opportunity to be heard under the Fifth Amendment to the United States Constitution in regard to any claims made against him for medical negligence.

110.   At all times material, Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois had a duty not to hinder, obstruct and obscure Dr. Abcarian's rights to notice and an opportunity to be heard in regard to the medical negligence claim.

111.   Clearly established principles of case law rendered such conduct as hereinabove described in retaliating against Dr. Abcarian by denying him fundamental Due Process rights to notice and the opportunity to be heard and by hindering, obstructing and obscuring his rights unconstitutional and accordingly, Defendants' conduct as aforesaid was not objectively reasonable.  Dr. Abcarian's rights were not vague and amorphous but rather of a fundamental nature and the contours of the rights were sufficiently clear that a reasonable person would understand that what they were doing violated Dr. Abcarian's rights.

29

112.  In addition, at all times material, Dr. Abcarian had a clearly established, most fundamental substantive Due Process right to be free under the Fifth Amendment to the United States Constitution from unwarranted intrusions upon his bodily integrity inasmuch as her had the right to be free from the intentional infliction of acute emotional distress by falsely reporting settlement of a medical negligence case to the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation and the National Practitioner Data Bank with the result that his qualifications and license to practice medicine were investigated by the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation, the National Practitioner Data Bank and State of Florida Department of Health, Division of Medical Quality Assurance.

113.  At all times material, Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board Of Trustees of The University of Illinois had a duty not to engage in unwarranted intrusion upon Dr. Abcarian's bodily integrity by intentionally inflicting severe emotional distress upon him.

114.  Clearly established principles of case law rendered such conduct as hereinabove described in retaliating against Dr. Abcarian by denying him fundamental substantive Due Process rights to bodily integrity and inflicting upon him severe emotional distress unconstitutional and accordingly, Defendants' conduct as aforesaid was not objectively reasonable. Dr. Abcarian's rights were not vague and amorphous but rather of a fundamental nature and the contours of the rights were sufficiently clear that a reasonable person would understand that what they were doing violated Dr. Abcarian's rights.

115.  At all times material hereto, Dr. Abcarian had the right under the Fifth Amendment to the United States Constitution to be free from being falsely accused of medical malpractice in a false and fraudulent lawsuit filed at the specific instance and behest of Defendants after all possible claims arising out of the death of John Behzad had been settled and compromised.  Such falsely filed lawsuit was a "state created danger" which had the effect of making him vulnerable to acute emotional distress, damaged his professional reputation, causing him economic damages by way

of attorney fees and called his license to practice medicine into question by the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation, the National Practitioner Data Bank and State of Florida Department of Health, Division of Medical Quality Assurance. He also had a liberty interest and a property interest in his good name and reputation under the Fifth Amendment to the United States Constitution.

116.   The actions aforesaid were commenced and continued with malice and with actual malice and with the intent to harm Dr. Abcarian in his emotional state and to create a legal plight to which he should not have been subject.   These actions deprived Dr. Abcarian of his liberty interest in his good name, reputation and right to be free from unwarranted intrusions upon his mental status, causing him great mental anguish.

117.   The actions aforesaid of the Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board Of Trustees of The University of Illinois shock the conscious of any reasonable person and sicken a reasonable citizen to realize that public officials and a public corporation of his own government would harass an employee and intentionally engage in such shameful conduct.

118.   Clearly established principles of case law rendered such conduct as hereinabove described in retaliating against Dr. Abcarian by falsely accusing him of medical malpractice in a false and fraudulent lawsuit filed at the specific instance and behest of Defendants after all possible claims arising out of the death of John Behzad had been settled and compromised not objectively reasonable.   Dr. Abcarian's rights were not vague and amorphous but rather of a fundamental nature and the contours of the rights were sufficiently clear that a reasonable person would understand that what they were doing violated Dr. Abcarian's rights.

119.   The submission of a false report of the settlement of a fraudulent medical negligence lawsuit that had no factual or substantive merit and was brought about by contrivance and conspiracy was in bad faith and malicious and in intentional disregard for the laws and rights of Dr. Abcarian without probable cause by Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J.

Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University Of Illinois to believe that their actions comported with law.

120. Acting under color of law, Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois flagrantly, and with malice and actual malice, without cause and in bad faith, intentionally worked a denial of Dr. Abcarian's rights, privileges or immunities secured by the United States Constitution or by Federal Law, to wit:

    A. By retaliating against him for his exercise of his right of free speech on matters of public concern.

    B. By retaliating against him for the exercise of his duty to speak on matters of public concern as required of him in the exercise of his office as a member of the Executive Committee of the Medical Service Plan.

WHEREFORE, Plaintiff Herand Abcarian, M.D., F.A.C.S., demands judgment for retaliation against him and violating his rights to Due Process against Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois jointly and severally, for actual, general, special, compensatory damages in the amount not less than $500,000.00 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the amount not less than $100,000.00 plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

## COUNT II
## VIOLATIONS OF 42 U.S.C. 1983, RIGHT TO TRIAL BY JURY

121. Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 103 above with the same force and effect as if set forth here at in full.

122.   At all times materials hereto, the conduct of all Defendants was subject to 42 U.S.C. Section 1983 and the Defendants were acting under color of law.

123.   At all times material, Dr. Abcarian had a clearly established right to trial by jury pursuant to the Eighth Amendment to the United States Constitution.

124.   At all times material, Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board Of Trustees of The University of Illinois had a duty to not to conceal and obstructing Dr. Abcarian's right to trial by jury on the issues maintained against him in the lawsuit in the Circuit Court of Cook County, Illinois, County Department, Law Division, styled as DAVID BEHZAD, as Special Administrator for the Estate of JOHN BEHZAD, deceased, Plaintiff, vs. HERAND ABCARIAN, M.D., Defendant, No. 06 L 006172.

125.   Clearly established principles of case law rendered such conduct as hereinabove described in concealing and obstructing Dr. Abcarian in his right to trial by jury unconstitutional and accordingly, Defendants' conduct in retaliating as aforesaid was not objectively reasonable.  Dr. Abcarian's rights were not vague and amorphous but rather of a fundamental nature and the contours of the rights were sufficiently clear that a reasonable person would understand that what they were doing violated Dr. Abcarian's rights.

126. Acting under color of law, Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois flagrantly, and with malice and actual malice, without cause and in bad faith, intentionally worked a denial of Dr. Abcarian's rights, privileges or immunities secured by the United States Constitution or by Federal Law, to wit:

A. Concealed from him the existence of a claim against him in a lawsuit in the Circuit Court of Cook County, Illinois, County Department, Law Division, styled as DAVID

33

BEHZAD, as Special Administrator for the Estate of JOHN BEHZAD, deceased, Plaintiff, vs. HERAND ABCARIAN, M.D., Defendant, No. 06 L 006172.

B.   Covertly obtained a final order in a lawsuit in the Circuit Court of Cook County, Illinois, County Department, Law Division, styled as DAVID BEHZAD, as Special Administrator for the Estate of JOHN BEHZAD, deceased, Plaintiff, vs. HERAND ABCARIAN, M.D., Defendant, No. 06 L 006172 so as to preclude Dr. Abcarian from exercising his rights to trial by jury.

C.   Intentionally attempted to continue to obstruct Dr. Abcarian's rights to trial on the merits order in a lawsuit in the Circuit  Court of Cook County, Illinois, County Department, Law Division, styled as DAVID BEHZAD, as Special Administrator for the Estate of JOHN BEHZAD, deceased, Plaintiff, vs. HERAND ABCARIAN, M.D., Defendant, No. 06 L 006172 once Dr. Abcarian learned of the existence of the claim against him and did so by means of a Petition for Leave to Intervene and a Motion to Dismiss Dr. Abcarian's Petition to vacate the order dismissing the cause with prejudice to his right to contest the issues against him.

WHEREFORE, Plaintiff Herand Abcarian, M.D., F.A.C.S., demands judgment for retaliation against him and violating his right to trial by jury against Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois jointly and severally, for actual, general, special, compensatory damages in the amount not less than $500,000.00 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the amount not less than $100,000.00 plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

## COUNT III

### VIOLATIONS OF 42 U.S.C. 1983, EQUAL PROTECTION OF THE LAWS

127.  Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 103 above with the same force and effect as if set forth here at in full.

128.  At all times materials hereto, the conduct of all Defendants was subject to 42 U.S.C. Section 1983 and the Defendants were acting under color of law.

129.  At all times material, Dr. Abcarian had a clearly established right to Equal Protection of the laws and freedom from disparate treatment pursuant to the Fourteenth Amendment to the United States Constitution and under 42 U.S.C. 11131 and 11131 based upon his Free Speech on matters of public concern.

130.  At all times material, Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board Of Trustees of The University of Illinois had a duty to refrain from retaliating against Dr. Abcarian for his exercise of his rights to Free Speech and a duty to conform their conduct in reporting and not reporting violations of 42 U.S,C. 11131 and 11133 to the requirements of that law.

131.  Clearly established principles of case law rendered such conduct as hereinabove described in according Dr. Abcarian disparate treatment in reporting or not reporting allegations of malpractice, settlement and permitted resignation while under investigation as retaliation against Dr. Abcarian unconstitutional and accordingly, Defendants' conduct in retaliating as aforesaid was not objectively reasonable.  Dr. Abcarian's rights, including his right not to be falsely reported as having had a settlement or judgment paid on his behalf were not vague and amorphous but rather of a fundamental nature and the contours of the rights were sufficiently clear that a reasonable person would understand that what they were doing violated Dr. Abcarian's rights.

132.  Acting under color of law, Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois flagrantly, and with malice and actual malice, without

35

cause and in bad faith, intentionally worked a denial of Dr. Abcarian's rights, privileges or immunities secured by the United States Constitution or by Federal Law, to wit:

A. Falsely reported to the National Practitioner Data Bank that a malpractice case had been settled on his behalf.

B. Failed to report the $6,750.000.00 settlement paid as a result of the death of Julius Izquierdo as the result of a surgeon's negligent perforation of his bowel during surgery.

C. Falsely reported to the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation that a settlement of a medical negligence case had been made on his behalf.

D. Refused and continuously refuses to withdraw the false reports made to the National Practitioner Data Bank and the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation.

WHEREFORE, Plaintiff Herand Abcarian, M.D., F.A.C.S., demands judgment for retaliation against him and violation of his rights to Equal Protection of the laws against Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois jointly and severally, for actual, general, special, compensatory damages in the amount not less than $500,000.00 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the amount not less than $100,000.00 plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

## COUNT IV
## VIOLATIONS OF 42 U.S.C. 1986, EQUAL PROTECTION OF THE LAWS

133. Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 103 above with the same force and effect as if set forth here at in full.

36

134.   At all times materials hereto, the conduct of all Defendants was subject to 42 U.S.C. Section 1986 and the Defendants were acting under color of law.

135.   At all times material, Dr. Abcarian had a clearly established right to be free from violations of his rights protected by the First, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

136.   At all times material, Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board Of Trustees of The University of Illinois had the power to prevent or aid in the prevention of the violations of the Constitutionally protected rights of Dr. Abcarian and the duty to act to prevent such violation and the duty not to refuse to so act pursuant to 42 U.S.C. 1986.

137.   Despite such duty to act to prevent the violations of Dr. Abcarian's rights, Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board Of Trustees of The University of Illinois neglected, failed or refused to do so and continue to so refuse to act to prevent the continuing violations of his rights by refusing to correct the false reports filed with the National Practitioner Data Bank and the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation.

138.   Clearly established principles of case law rendered such conduct as hereinabove described in failing to act to prevent the violation of Dr. Abcarian's rights when they had the power to do so unconstitutional and accordingly, Defendants' conduct in refusing to act  as aforesaid was not objectively reasonable.  Dr. Abcarian's rights were not vague and amorphous but rather of a fundamental nature and the contours of the rights were sufficiently clear that a reasonable person would understand that what they were doing violated Dr. Abcarian's rights.

139.   Acting under color of law, Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet,

Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois flagrantly, and with malice and actual malice, without cause and in bad faith, intentionally worked a denial of Dr. Abcarian's rights, privileges or immunities secured by the United States Constitution or by Federal Law, to wit:

A. Refusing to act to prevent the violations of Dr. Abcarian's rights at and prior to the time such violations were happening, except as to the failure to correct the false reports which is a violation of a continuing kind, not a one time occurrence.

B. Refusing on an on-going basis, to correct the false reports filed with the National Practitioner Data Bank and the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation.

140.  The on-going premeditated refusal to correct the false reports is intentional, malicious and is a continuing act of actual malice which is so flagrant and deliberate and calculated to inflict acute emotional distress and cause continuing economic damages that it shock the conscious of any reasonable person and sicken a reasonable citizen to realize that public officials and a public corporation of his own government would harass an employee and intentionally engage in such shameful conduct.

WHEREFORE, Plaintiff Herand Abcarian, M.D., F.A.C.S., demands judgment for retaliation against him and violating his right to trial by jury against Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois jointly and severally, for actual, general, special, compensatory damages in the amount not less than $1,000,000.00 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the amount not less than $500,000.00 plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

## COUNT V
## VIOLATION OF 42 U.S.C. 1981, EQUAL PROTECTION

141.  Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 103 above with the same force and effect as if set forth herein in full.

142.  At all times materials hereto, the conduct of all Defendants were subject to 42 U.S.C. Section 1981.

143.  Acting under color of law, Defendants worked a denial of Dr. Abcarian's rights, privileges or immunities secured by the United States Constitution or by Federal Law, to wit:

A.  Herand Abcarian, M.D. was a "Covered Person" under the University of Illinois Liability Self- Insurance Plan, [the Plan] copy of which is attached hereto as Exhibit E.

B.  Under Article IV of the Plan, the Board of Trustees of the University of Illinois had the duty to defend any suit seeking damages against Dr. Abcarian and an implied duty not to foment a fraudulent lawsuit.

C.  Under Article IV of the Plan, a Covered Person has the right to refuse to consent to the settlement of a claim against him and he is still entitled to payment by the Plan of any liability judgment against him in the lesser amount of the amounts provided under Article IX or the amount the claim could have been settled for at the time of the  refusal of the Covered Person to consent to settlement; however in no event is the Plan permitted to evade the right of the Covered Person to consent or not to consent to settlement.

D.  As an insurer, subject to the laws of the State of Illinois, the Plan had an obligation to provide independent counsel to Dr. Abcarian at the Plan's expense when there was a conflict of interest between the interest of the Plan and its insured.

E.  A conflict of interest existed when the Plan determined to pay the claim brought on behalf of the Estate of John Behzad and refused to agree to Dr. Abcarian's attempt to vacate the dismissal order and contest the merits of the claim brought against him.

F.  Although demand was made upon the Board of Trustees of the University of Illinois and the Plan to provide independent counsel, the Plan refused to do so.

G.  Dr. Abcarian had the same right to equal protection under 42 U.S.C. 1981 to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property.

H.  Dr. Abcarian's rights under the Plan and under 42 U.S.C. 1981 were well known to The Board of Trustees of the University of Illinois inasmuch as the University operated and operates an academic program know as the Office of Risk Management Research which states as its goals:

> */Teaching/*
> Preparing and educating students to be informed consumers.  Preparing and educating students for enterprise risk management careers.  Preparing the next generation of industry leaders and RMI educators.

> */Research/*
> Developing the premier center for practical research in risk management and insurance.

> */Service/*
> Serving as an essential forum for the interaction between industry and education.

> */Student Access/*
> Enabling our corporate partners to access the best and the students in the College of Business.

I.  Additionally, the University maintains a faculty of professors, including doctoral level qualified professors who teach insurance and insurance coverage issues at the undergraduate and graduate level at the University of Illinois, including in academic programs of finance, business and insurance law.

J.  Upon information and belief, the Plan routinely defend lawsuits against other physicians who are staff members at UIMCC and in other medical programs conducted

40

by the University and accords such persons the right to refuse to consent to settlements of claims against them and further provides them independent counsel at the Plan's expense in the event of conflicts of interest.

144.  Clearly established principles of case law rendered such conduct as hereinabove described in failing to provide a defense to Dr. Abcarian and failing to seek  his consent to settlement and failing to honor his right to refuse settlement and failing to provide him with independent counsel of his own selection when there was an irreconcilable conflict of interest between the Plan and its intent to settle a non-meritorious case and to dismiss his petition to reopen the case and his intent to reopen and contest the claim made against him unconstitutional and accordingly, Defendants' conduct in refusing to provide him a defense and exercise his rights to contest the merits of the claim against him as aforesaid was not objectively reasonable.  Dr. Abcarian's rights were not vague and amorphous but rather of a fundamental nature and the contours of the rights were sufficiently clear that a reasonable person would understand that what they were doing violated Dr. Abcarian's rights.

145.  Acting under color of law, Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois flagrantly, and with malice and actual malice, without cause and in bad faith, intentionally worked a denial of Dr. Abcarian's rights, privileges or immunities secured by the United States Constitution or by Federal Law as aforesaid.

WHEREFORE, Plaintiff Herand Abcarian, M.D., F.A.C.S., demands judgment against Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois for their violation of his rights under 42 U.S.C. 1981 jointly and severally, for actual, general, special, compensatory damages in the amount of $500,000.00 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the

amount of $100,000.00 plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

## COUNT VI

## EQUITABLE AND OTHER RELIEF FOR DR. ABCARIAN'S CONTINUING DAMAGES ARISING OUT OF DUE PROCESS AND EQUAL PROTECTION VIOLATIONS

146.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 103 above with the same force and effect as if set forth herein in full.

147.   Since Dr. Abcarian lacks an adequate remedy at law for the continuing refusal of Defendants to correct the records with the National Practitioner Data Bank and the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation, and since Defendants refuse to do so, he prays the court for an order requiring Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois to submit all appropriate and necessary documentation to the National Practitioner Data Bank and the Illinois Department of Financial and Professional  Regulation, Division of Professional Regulation needed to cause such agencies to remove the false  reports of the settlement of a medical negligence claim or lawsuit from their records with a complete explanation of the wrongdoing on the part of Defendants which caused the false reports to be filed together with an award of costs and expenses including legal expenses incurred by Dr. Abcarian in prosecuting the action in the Circuit Court of Cook County, Illinois to reopen the proceedings in the lawsuit styled as DAVID BEHZAD, as Special Administrator for the Estate of JOHN BEHZAD, deceased, Plaintiff, vs. HERAND ABCARIAN, M.D., Defendant, No. 06 L 006172 and his costs and expenses including legal fees in pursuing this action and an award of punitive damages for the breach by the University of Illinois Liability Self-Insurance Plan of its fiduciary duties to him.

WHEREFORE, Herand Abcarian, M.D., F.A.C.S. demands judgment against Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois for their violation of his rights and the breaches of duty under the University of Illinois Liability Self-Insurance Plan jointly and severally, for declaratory relief as specified in paragraph 147 together with his actual, general, special, compensatory damages in the amount of $500,000.00 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the amount of $100,000.00 plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

## COUNT VII
### INTENTIONAL INFLICTION OF ACUTE MENTAL DISTRESS

148.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 103 above with the same force and effect as if set forth herein in full.

149.   The conduct of Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois as described hereinabove was and continues to be extreme and outrageous and malicious and in bad faith.

150. The conduct of Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois as described hereinabove was and continues to be intended to inflict severe emotional distress or Defendants knew that there was at least a high probability that their conduct would inflict severe emotional distress.

151.   The conduct of Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq.,

Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois as described hereinabove was and continues to proximately cause Dr. Abcarian severe emotional distress.

WHEREFORE, Plaintiff Herand Abcarian, M.D., F.A.C.S., demands judgment against Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois for their intentional infliction of severe mental distress jointly and severally, for actual, general, special, compensatory damages in the amount of $500,000.00 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the amount of $100,000.00 plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

## COUNT VIII
## ABUSE OF PROCESS

152.  Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 103 above with the same force and effect as if set forth herein in full.

153. Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois had the ulterior purpose or motive of furtherance of the conspiracy to intentionally inflict severe emotional distress and other harm on Dr. Abcarian in connection with the filing of the lawsuit in the Circuit Court of Cook County, Illinois, County Department, Law Division, styled as DAVID BEHZAD, as Special Administrator for the Estate of JOHN BEHZAD, deceased, Plaintiff, vs. HERAND ABCARIAN, M.D., Defendant, No. 06 L 006172.

154.  Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University

44

of Illinois acted on such ulterior purpose or motive in causing and requiring Kathleen Zellner to file the lawsuit in the Circuit Court of Cook County, Illinois, County Department, Law Division, styled as DAVID BEHZAD, as Special Administrator for the Estate of JOHN BEHZAD, deceased, Plaintiff, vs. HERAND ABCARIAN, M.D., Defendant, No. 06 L 006172, and in causing and requiring her to dismiss such lawsuit with prejudice so as to foreclose Dr. Abcarian's rights to Due Process and his right to a jury trial on the allegations of the meritless complaint filed against him.

155.  By means of such actions, Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flanigam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois committed the tort of abuse of process and proximately caused harm to Dr. Abcarian as set forth hereinabove.

WHEREFORE, Plaintiff Herand Abcarian, M.D., F.A.C.S., demands judgment against Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois for their abuse of process jointly and severally, for actual, general, special, compensatory damages in the amount of $500,000.00 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the amount of $100,000.00 plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

## COUNT IX
## LIBEL

156.  Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 103 above with the same force and effect as if set forth herein in full.

157.  On or about August 2, 2006, Defendant Christine Flaningam knowingly made false and untrue statements of material fact of and concerning Dr. Abcarian and his professional reputation

45

falsely claiming the there had been a "delay in diagnosis" and a "delay in performance" of a colonoscopy and a "settlement" in the amount of "$950,000.00" was made on behalf of Dr. Abcarian as a result thereof.  Such statements were and are untrue and were and are libelous *per se*.

158.  These statements were published to third parties.

159.  On or about August 11, 2006, Defendant Patricia Kale knowingly made false and untrue statements of material fact of and concerning Dr. Abcarian and his professional reputation falsely claiming the there had been a "settlement or final judgment" made on behalf of or against Dr. Abcarian in the amount of "$950,000.00" and that the actions of Dr. Abcarian had "resulted in the death of the claimant." Such statements were and are untrue and were and are libelous *per se*.

160.  These statements were made with actual malice and malice and were knowingly false and intentional made and made in bad faith for the express purpose of damaging Dr. Abcarian's reputation and causing him harm.  No privilege can attach to such statement due to the fact that such false statements were made for the sole and exclusive purpose of harming the professional reputation of Dr. Abcarian.

161.  Dr. Abcarian is a private person who has done nothing to inject himself in the public arena and accordingly, is not a public figure.

162.   Defendants Timothy McDonald, M.D., William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Michael Trucco, Esq and The Board of Trustees of The University of Illinois acted in concert and conspired with Patricia Kale and Christine Flaningam in making the libelous statements or alternatively ratified such statements and adopted such libel as their own statements.

163.  The libelous statements were lodged with public agencies with the intent and purpose that such statements be republished by such agencies so as to continue to damage the professional reputation of Dr. Abcarian.

164.  At least one such republication of the false and untrue statements made by Patricia Kale has occurred in the State of Florida on or about March 20, 2008.

165.  By means of the premises and as a direct and proximate result thereof, Dr. Abcarian was harmed in his professional reputation, incurred acute mental distress and anguish and has been required to spend considerable sums in an effort to remove such statements from records of public agencies.

WHEREFORE, Plaintiff Herand Abcarian, M.D., F.A.C.S., demands judgment against Defendants Timothy McDonald, M.D., Patricia Kale, William H. Chamberlin, Jr., M.D., Nikki Centomani, Stuart Allen, Barbara McColgin, Chris J. Mollet, Esq., Thomas R. Bearrows, Esq., Christine Flaningam, Michael Trucco, Esq., and The Board of Trustees of The University of Illinois for their libelous statements of and concerning Plaintiff jointly and severally, for actual, general, special, compensatory damages in the amount of $500,000.00 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the amount of $100,000.00 plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

Respectfully submitted,


S/ JOSEPH MICHAEL O'CALLAGHAN


Of counsel:

O'Callaghan & Colleagues, P.C.

208 West Washington Street

Suite 2301

Chicago, Illinois 60606

312.332.1600

ARDC No. 2083752

47

Herand **Abcarian**, M.D.

# CURRICULUM VITAE

08CV3843

JUDGE DER-YEGHIAYAN

MAGISTRATE JUDGE NOLAN

JH

Herand Abcarian, M.D., FACS
Turi Josefsen Professor and Chairman
Department of Surgery
University of Illinois College of
Medicine at Chicago
840 S. Wood Street
Chicago, Illinois  60612

Date of Birth:     January 23, 1941
Birthplace:        Ahvaz, Iran

Home Address:      1430 Lathrop
                   River Forest, Illinois  60305

Married:           Karen – 1969

Children:          Son – Gregory, 1974
                   Daughter – Ariane, 1978
                   Daughter – Margot, 1981

| **Academic Degrees:** | Combined Educational System | |
| --- | --- | --- |
| | College with Medical School M.D. | 1965 |
| | Tehran University School of Medicine | 1958-1965 |
| **Internship:** | Rotating Internship | 1966-67 |
| | Cook County Hospital | |
| | Chicago, Illinois | |
| **Residency:** | Residency – General Surgery | 1967-71 |
| | Residency – Colon and Rectal Surgery | 1971-72 |
| **Board Certification:** | American Board of Surgery | 1972 |
| | American Board of Colon and Rectal Surgery | 1972 |
| **Licensure:** | State of Illinois | 1972 |
| | State of Florida | 1972 |
| **Honors:** | Honor Student Graduating Class | |
| | Tehran University School of Medicine | 1965 |
| **Awards:** | Best Scientific Paper | |
| | American Society of Colon and Rectal Surgeons - 1975 | |

1

**EXHIBIT**

tabbies®

A

Herand **Abcarian**, M.D.

Best Scientific Paper
American Society of Colon and Rectal Surgeons – 1976

Co-Author – Best Paper by Affiliate, Member
 American Society of Colon and Rectal Surgeon - 1976

Best Scientific Exhibit – 1976

Best Scientific Paper
American Society of Colon and Rectal Surgeons – 1984

**Memberships in Professional Societies:**

American Surgical Association
Chicago Medical Society
American Medical Association
Illinois State Medical Society
Illinois State Surgical Society
- Secretary 1986
- President 1997-98
Midwest Surgical Association
American Society of Gastrointestinal Endoscopy
Association of Academic Surgery
Midwest Society of Colon and Rectal Surgeons
Chicago Surgical Society
- President 2002-2003
Warren H. Cole Society
Society of Surgery of the Alimentary Tract
Central Surgical Association
American College of Gastroenterology
Society of American Gastrointestinal Endoscopic Surgeons
- Board of Governors 1980-1986
Western Surgical Association
Sydney Society of Colon and Rectal Surgeons
The New York  Academy of Sciences
American College of Surgeons
International Society of University Colon/Rectal Surgeon
American Board of Colon and Rectal Surgery
- Executive Director
American Society of Colon and Rectal Surgeons
- Advisory Council
- Member , 1974-1980
- Chairman , 1978-1980
- Program Chairman Postgraduate Courses in
- Colon and Rectal Surgery, 1981

Herand **Abcarian**, M.D.

- Education Committee, 1974-1976
- Recertification Committee, 1976-1978
- Program Chairman, 1981
- Representative to CMSS, 1979, 1981, 1987
- Secretary, 1984-1986
- President Elect, 1987
- President, 1988-1989
- President, Research Foundation 1998-1998

American Board of Medical Specialties

- Chairman, Bylaws Committee 1998-99

**Editorial Staff:**

Diseases of the Colon and Rectum
1978 – Present

Current Surgery
1978 – Present

**Reviewer:**

World Journal of Surgery
1996 – Present

Annals of Surgery
1996 - Present

**Academic
Appointments:**

Instructor in Surgery
Loyola University Stritch School o f Medicine 1970-72

Assistant Professor of Surgery
Abraham Lincoln School of Medicine
University of Illinois, 1972

Associate Professor of Surgery
Abraham Lincoln School of Medicine
University of Illinois, 1977

Professor of Clinical Surgery
University of Illinois College of Medicine at Chicago, 1983

Turi Josefsen Professor of Surgery
University of Illinois College of Medicine at Chicago
1991

Adjunct Professor of Surgery
F. Edward Herbert School of Medicine
Uniformed Services University of the Health Sciences
2000

Herand **Abcarian**, M.D.

**Appointments:**

Attending
Section of Colon and Rectal Surgery
Cook County Hospital
1972-95

Attending
University of Illinois Chicago Medical Center
1972 – Present

Chairman
Section of Colon and Rectal Surgery
Cook County Hospital
1972-93

Chairman
Division of General Surgery
Cook County Hospital
1982-84

Acting Chairman
Department of Surgery
Cook County Hospital
1985-86

Interim Head
Department of Surgery
University of Chicago College of Medicine at Chicago
1989-1993

Head
Department of Surgery
University of Illinois College of Medicine at Chicago
1993-2006

President – Executive Committee of the Medical Staff
University of Illinois Chicago Medical Center
2001-2003

**Affiliations:**

Attending Surgeon
Grant Hospital of Chicago
1974 – Present

Herand **Abcarian**, M.D.

> Attending Surgeon
> Gottlieb Memorial Hospital
> 1974- Present
>
> Attending Surgeon
> Rush Presbyterian – St. Luke's Medical Center
> 1984 – 2001
>
> Attending Surgeon
> Advocate Lutheran General Hospital
> 2002 - Present

## RESEARCH ACTIVITIES:

1.  Development of autologous condyloma vaccine for the immunotherapy of anal condyloma.
    Funded through private donations of Dr. Durand Smith, 1972-74.

2.  Rectrosphincteric manometric studies in patients with chronic anal fissure (preoperative and after surgery.)
    Funded through the American Society of Colon and Rectal Surgeons Research Education Foundation, 1976-78 - $5000.00

3.  Prospective study of bacteria during lower gastrointestinal endoscopy in 100 patients.  1979

4.  Prospective comparison of the efficacy of Providone Iodine bowel preparation vs. Standard antibiotic preparation in colon surgery.
    Funded through the American Society of Colon and Rectal Surgeons Research Education Foundation, 1983-84 - $10,000.00

5.  Perioperative use of antibiotics in elective colon surgery.
    Funded through Miles Laboratories - $100,000.00

## PRESENTATIONS

1.  Lateral Internal Sphincterotomy in the Treatment of Chronic anal Fissure –  the American Society of Colon and Rectal Surgeons – May 1975; American College of Surgeons – October, 1975; American Medical Association; Section of Colon and Rectal Surgeons – June, 1976.

2.  Principals of Management of Colon and Rectal Foreign Bodies –  the American Society of Colon and Rectal Surgeons – May, 1976 and the American College of Surgeons – October, 1976 with E. Hambrick and M. Eftaiha.

Herand **Abcarian**, M.D.


3.    Management of Complicated Ischiorectal Abscesses –  the American College of Surgeons – October 1978 and the American Society of Colon and Rectal Surgeons, June, 1979.

4.    Complications of Intestinal Stomas –  the American College of Surgeons Clinical Congress – October, 1983 and American Society of Colon and Rectal Surgeons, May, 1984 with RK Pearl.

5.    End Loop Stomas:  A New Generation of Stomas  -  the American College of Surgeons – October, 1984 and the American Society of Colon and Rectal Surgeons, May, 1985 with ML Prasad, R. Nelson and RK Pearl.

6.    Perineal Proctectomy and Coloanal Anastomosis in Treatment of Rectal Prolapse –  the American College of Surgeons – October, 1985 and the American Society of Colon and Rectal Surgeons – May, 1986 with ML Prasad and R. Nelson.

7.    Anorectal Abscesses:  the Importance of Early Surgical Exploration – the American College of Surgeons – 1986 and American Society of Colon and Rectal Surgeons – 1987 with RK Pearl, ML Prasad, and CP Orsay.

8.    Simultaneous Longitudinal and Radial Records of Anal Canal Pressures – the American Society of Colon and Rectal Surgeons – 1987 with WL Williamson, R. Nelson, CP Orsay.

9.    Necrotizing Perineal Infections, Factors Influencing Survival – the American College of Surgeons – 1987 J. Fowler and RK Pearl.

10.   Management of Traumatic Cloaca – the American College of Surgeons 1987 with ML Prasad and E. Hambrick, and RK Pearl.

11.   Sliding Anoplasty for the Treatment of Anal Stricture – the American College of Surgeons – 1988 and the American Society of Colon and Rectal Surgeons – 1989 with V. Hooks, III and RK Pearl.

12.   Three Dimensional Teaching Model of the Pelvic Floor, Rectum, and Anus – the American College of Surgeons – 1989 and American Society of Colon and Rectal Surgeons - 1989 with RK Pearl.

13.   The Toppled C-Pouch for Restoration of Function in Patient with Failed Straight Ileoanal Pull-Through – the American Society of Colon and Rectal Surgeons – 1989 with RL Nelson and RK Pearl.

Herand **Abcarian**, M.D.

14. The Efficacy of Chemoradiation on Anorectal Cancer – the American Society of Colon and Rectal Surgeons – 1990 with R. Sullivan, R. Nelson, ML Prasad and RK Pearl.

15. Pelvic Floor Reconstruction with Autogenous Fascia Data for Recurrent Rectoenterocele – the American College of Surgeons – 1990 with S Kumar and RK Pearl.

16. Maximus Transfer in Treatment of Anal Incontinence – the American College of Surgeons 1990 with ML Prasad and RK Pearl.

17. Clinical Relevance of Variant Abdominal Arterial Anatomy – the American College of Surgeon – 1990 with R Nelson, RK Pearl and O Jonasson.

18. Distent Metastasis to Small and Large Bowel –the American College of Surgeons – 1990 with TM Nelson, J Cintron and B Duarte.

19. Correction of Tubular Anal Stenosis with Pedicled Gluteal Flap – The "S" Plasty – at the American College of Surgeons – 1991 with S. Kumar and ML Prasad.

20. The Role of Seton in the Management of Anorectal Fistulas –the American College of Surgeons – 1991 with RK Pearl, AJ Andrews, CP Orsay, RI Weisman, JR Cintron, ML Prasad, RL Nelson.

21. The Technical Guidelines for Resection of Villous Adenomas of the Rectum – American College of Surgeons – 1992 with RK Pearl, RI Weisman, CP Orsay, ML Prasad, RL, Nelson, E. Hambrick.

22. Anatomy of the Anal Sphincter Muscles:  In-Vivo Assessment with Magnetic Resonance Imaging - the American College of Surgeons – 1993 with RK Pearl, JR Cintron, RA Strong, BG Langer, ML Prasad, CP Orsay.

23. Management of Recurrent Rectal Prolapse - American College of Surgeons – 1993 with SA Fengler, RK, Pearl, ML Prasad, JR Cintron, CP Orsay, R. Nelson, E Hambrick.

24. Curative Surgery for Colon and Rectal Cancer and Non-Operative Treatment of Hemorrhoids – February 1996, Cleveland Clinic Foundation, Cleveland, Ohio.

25. Colorectal Carcinoma – March 1996, Grand Rounds, Loyola University Medical Center, Chicago, Illinois.

26. Moderator – Panel of Inflammatory Bowel Disease, April 1996, International Society of University Colon and Rectal Surgeons, Lisbon, Portugal.

Herand **Abcarian**, M.D.

27.  Anorectal Fistulas" and "Benign Anorectal Disease - August 1996, Review of Lower Gastrointestinal and Breast Disease David Grant Medical Center, Fairfield, CA.

28.  Advances in the  Treatment for Inflammatory Bowel Disease, Neoplasms of the Colon and Rectum and Benign Anorectal Disease  - August 1996, National Center for Advanced Medical Education, Chicago, IL.

29.  Advances in the Treatment of Inflammatory Bowel Disease, Operative Treatment of Colorectal Cancer and Benign Anorectal Disease - September 1996, National Center for Advanced Medical Education, Chicago, IL.

30.  Operative Treatment of Rectal Cancer - September 12, 1996, New York Society of Colon and Rectal Surgeons, New York, NY.

31.  Rationale for Curative Surgery for Colorectal Cancer - January 1997, Kansas City Surgical Society, Kansas City, MO.

32.  Panel Moderator - March1997, Emerging Surgical Technologies/Regional Conflicts, Versalles, France.

33.  Management of Common Anorectal Problems and Management of Colon Cancer - May 1997, 130th Annual Session of the Texas Medical Association, Houston, TX.

34.  Surgical Management of Inflammatory Bowel Disease – May 1997, Clinical Conference - Northern Illinois Medical Center, McHenry, IL.

35.  International Surgical Symposium - May 1997, Madrid, Spain.

36.  Techniques and Treatments of Complex Anorectal Fistulas - July 1997, 50th Congress of Japanese Society of Gastroenterological Society, Yokahoma, Japan.

37.  Chemoradiation for Anal Cancers and Lower Rectal Cancers - July 31 - August 3, 1997, Colorectal Surgical Issues & Updates; Piedmont Society Colon and Rectal Surgeons, Hamilton, Bermuda.

38.  Chemoradiation of Rectal Carcinoma - October 1997, Nottingham International Colorectal Cancer Symposium - University of Nottingham, United Kingdom.

39.  Surgical Treatment of Constipation - November 1997, XX International Course in Surgery, Prosper Hospital, Recklinghausen, Germany.

40.  Emerging Surgical Technologies/Regional Conflicts:  the Military Surgeon, March 1998, Versailles France.

Herand **Abcarian**, M.D.

41.    Necrotizing Perianal Infection.  4th Singapore General Hospital Colorectal Week, April 1998, Singapore Japan.

42.    Moderator:  Benign Anorectal Fistulas, ASCRS Annual Meeting, May 1998, San Antonio, Texas.

43.    Fistula-in-Ano:  Seton or Lay Open"  International Society of University Colon and Rectal Surgeons, June 1998, Malmo Sweden

44.    Stoma Complications, Colorectal Polyps, Downstaging of Colorectal Cancer: Indications and Results, Classification and Treatment of Anal Cancer, Nonoperative Treatment of Hemorrhoids, Low and High Rectovaginal Fistulas at Current Trends in Colorectal Surgery:  Societa Italiana Di Colon-Proctologia, Sept. 1998, Sorronto, Napali Italy.

45.    Moderator:  Common Anorectal Problems.  84th American College of Surgeons Clinical Congress, Oct 1998, Orlando Florida.

46.    Surgical Aspects of Sphincter Preservation Therapy.   Indiana Society of Radiation Oncology, Indianapolis, IN, Nov. 98.

47.    Treatment of Common Anorectal Problems.   Surgical Grand Rounds, Sinai Hospital of Baltimore , Feb 1999, Baltimore, MD.

48.    Emerging Surgical Technologies/Regional Conflicts:  The Military Surgeon, April 1999, Versailles France.

49.    Surgical Aspects of Sphincter Preservation Therapy.   1999 Presentation of Primary Care Physician, Union Hospital, April 1999, Terre  Haute, IN.

50.    Evolution and Pitfalls of Stapling Surgery.  Joseph B. Priestley Lecturer, Surgical Symposium on Complications in Surgery, Throckmorton Surgical Society, May 1999, Des Moines, Iowa.


## ABSTRACTS

1.    **Abcarian** H:  Surgical Correction of Chronic anal Fissure:  Results of Lateral Internal Sphincterotomy vs. Fissurectomy Midline Sphincterotomy.   Current Surgery, 38:197, 1981.

2.    Prasad ML, Pearl RK, Orsay CP, **Abcarian** H:  End-loop Ileocolostomy.  Current Surgery, 1984.

Herand **Abcarian**, M.D.

3.      Prasad ML, **Abcarian** H:  Surgical Treatment of Anorectal Abscesses:  The Case for Definitive Therapy.  Proct. Inst. Med. Chgo, Vol 37, 1984.

**LETTERS**

1.      Correspondence Society of Surgery:  Collected Letters, Question 11/92, Vol 15, No. 11; Response – 4/92, Vol. 14, No. 4.

Herand **Abcarian**, M.D.

## PUBLICATIONS

1.  **Abcarian H**, Lee H, Barker WL:  Primary Endobronchial Myxoma.  Ann Thor Surg, 15:287-290, 1973.

2.  Hambrick E, **Abcarian H**, Smith D:  Malignant Melanoma of the Rectum in the Negro Man.  Dis Colon Rectum, 17:360-364, 1974.

3.  Nicosia J, **Abcarian**:  Mucocele of the Distal Rectal Segment:  A Sequelae of Trauma to the Perineum.   Dis Colon Rectum, 17:536-539, 1974.

4.  **Abcarian H**:  Lateral Internal Sphincterotomy:  A New Technique for the Treatment of Chronic Fissure-In-Ano.  Surg Clin N Am, 55:143, 1975.

5.  **Abcarian H**:  Acute Suppurations of Anorectum.  Surg Ann, 285-315, 1975.

6.  **Abcarian H**, Smith D, Sharon H:  The Immunotherapy of Anal Condylomata Acuminata.  Dis Colon Rectum, 19:237-244, 1976.

7.  **Abcarian H**, Sharon N:  The Effectiveness of Immuno-therapy in the Treatment of Anal Condyloma Accuminatum.  Surgical Forum, 27:127, 1976.

8.  Nicosia J, **Abcarian H**:  The Localization of Recto-Sigmoid Tumors or Biopsy Sites by Methylene Blue Marking.  Dis Colon Rectum, 20:231-235, 1977.

9.  **Abcarian H**, Sharon N:  Immunotherapy in the Treatment of Anal Condyloma Accuminatum. J Surg Res, 22:231-236, 1977.

10. Read D, Hambrick E, **Abcarian H**, Levine H:  The Preoperative Diagnosis of Liver Metastases in Patients with Colorectal Carcinoma.  Dis Colon Rectum, 20:101-106, 1977.

11. Eftaiha M, **Abcarian H**:  The Surgical Treatment of Pilonidal Disease.  Dis Colon Rectum, 20:279-286, 1977.

12. **Abcarian H**:  Panel Discussion – Dilemma of Pilonidal Disease:  Surgical Treatment.  Dis Colon Rectum, 20:288-298, 1977.

13. Eftaiha M, Hambrick E, **Abcarian H**:  The Principles of Management of Colorectal Foreign Bodies.  AMA  Arch Surg, 112:691-695, 1977.

14. **Abcarian H**, Eftaiha M:  Management of Perineal Wounds After Proctocelectomy.  Dis Colon Rectum, 21:287-291, 1978.

15. **Abcarian H**, Udezue N:  Colentric Fistulae.  Dis Colon Rectum, 21:281-286, 1978.

Herand **Abcarian**, M.D.

16.    **Abcarian H**, Lowe R:  Colon and Rectal Trauma.  Surg Clin N Amer, 58:519-438, 1978.

17.    Prasad ML, **Abcarian H**: Urinary Retention Following Surgery for Benign Anorectal Disease.  Dis Colon Rectum, 21:490-492, 1978.

18.    Thornton J, **Abcarian H**:  Surgical Treatment of Perianal and Perineal Hidradenitis Suppurativa.  Dis Colon Rectum, 21:573-577, 1978.

19.    **Abcarian H**:  Symposium on Abdominal Stomas.  Contemp Surg, 13:23-53, 1978.

20.    **Abcarian H**, Eftaiha M, Kraft A, Nyhus L:  Colonic Complications of Acute Pancreatitis.  Arch. Surg., 114:995-1001, 1979.

21.    Hambrick E, **Abcarian H**, Smith DL:  Perineal Endometrioma  in Episiotomy Incision:  Clinical Features and Management.  Dis Colon Rectum, 22:550-552, 1979.

22.    Read D, **Abcarian H**:  Prospective Surgery of 474 Patients with Anorectal Abscess. Dis Colon Rectum, 22:556-568, 1979.

23.    **Abcarian H**:  Anorectal Disorders:  When is Conservative Care Enough?  Mod Med, 30:37-53, 1980.

24.    Prasad ML, **Abcarian H**:  The Malignant Potential of Condyloma Acuminatum. Dis Colon Rectum, 23:191, 1980.

25.    **Abcarian H**:  The Surgery of Chronic Anal Fissure.  Dis Colon Rectum, 23:31, 1980.

26.    Prasad ML, **Abcarian H**, Read D:  Supralevator Abscess:  Diagnosis and Treatment.  Dis Colon Rectum, 24:456, 1981.

27.    Nelson R, **Abcarian H**:  Lateral Internal Sphincterotomy for Chronic Anal Fissure. Current Surg, 4:223, 1981.

28.    **Abcarian H**, Muldoon J:  Common Problems:  Hemorrhoids.  Patient Care, 15:16, 1981.

29.    Kumar S, **Abcarian H**, Prasad ML, Lakshmanan S:  Bacteremia Associated with Lower Gastrointestinal Endoscopy, Fact or Fiction?  I Colonoscopy.  Dis Colon Rectum, 25:131, 1982.

Herand **Abcarian**, M.D.

30.  Rao TR, Hambrick E, **Abcarian H**, Salgia K, Recant WM:  Colorectal Linitis Plastica.  Dis Colon Rectum, 25:239, 1982.

31.  Nelson RL, **Abcarian H**, Prasad ML:  Iatrogenic Perforation of the Colon and Rectum.  Dis Colon Rectum, 25:305, 1982.

32.  Gianfrancisco J, **Abcarian H**:  Pitfalls in the Treatment of Massive Lower Gastrointestinal Bleeding with "Blind" Subtotal Colectomy.  Dis Colon Rectum, 25:441, 1982.

33.  Donahue PE, **Abcarian H**, Nyhus LM:  Surgeons as Endoscopists.  Surg Gastroenterol, 1:73, 1982.

34.  **Abcarian H**, Lakshmanan S, Read DR, Roccaforte P:  The Role of Internal Sphincter in Chronic Anal Fissure.  Dis Colon Rectum, 25:525, 1982.

35.  **Abcarian H**, Sharon N:  The Long Term Effectiveness of the Immunotherapy of Anal Condyloma.  Dis Colon Rectum, 25:648, 1982.

36.  **Abcarian H**:  The Management of Recurrent Anorectal Abscesses.  Contemp Surg, 26:22, 1982.

37.  Kumar S, **Abcarian H**, Prasad ML, Lakshamanan S: Bacteremia Associated with Lower Gastrointestinal Endoscopy, Fact or Fiction?  III Proctosigmoidoscopy .  Dis Colon Rectum, 26:22, 1983.

38.  Chrabot C, Prasad ML, **Abcarian H**:  Recurrent Anorectal Abscesses, Dis Colon Rectum, 26:105, 1983.

39.  Prasad ML, **Abcarian H**, Ramanujam PS:  Modification of Rectal Purse String Suture for End-to-End Anastomotic Stapler Use.  Surg Gynec Obstet, 157:78-79, 1983.

40.  **Abcarian H**, Eftaiha M:  Floating Free-Standing Anus:  A Complication of Massive Anorectal Infection.  Dis Colon Rectum, 25:516, 1983.

41.  Ramanujam PS, Prasad ML, **Abcarian H**:  Role of Seton in Fistulotomy of the Anus.  Surg Gynec Obstet, 157:419, 1983.

42.  Kumar S, Appavu S, **Abcarian H**, Baretta T:  Amyloidosis of the Colon:  Report of a Case and Review of the Literature.  Dis Colon Rectum, 26:451, 1983.

43.  Prasad ML, Nelson R, Hambrick E, **Abcarian H**:  York Mason Procedure for Repair of Postoperative Rectoprostatic Urethral Fistula.  Dis Colon Rectum, 26:716, 1983.

Herand **Abcarian**, M.D.

44.  Hoffman A, Young Q, Bright-Asare P, **Abcarian H**, et al:  Early Detection of Bowel Cancer at an Urban Public Hospital:  Demonstration Project.  Ca-A Cancer Journal for Clinicians, 33:344, 1983.

45.  Prasad ML, Pearl RK, Orsay CP, **Abcarian H**:  Rodless Ileostomy:  A Modified Loop Ileostomy.  Dis Colon Rectum, 27:334, 1983.

46.  Prasad ML, Pearl RK, **Abcarian H**:  End-Loop Colostomy.  Surg Gynec Obstet, 158:380, 1984.

47.  Pearl RK, Prasad ML, Orsay CP, Nelson RL, **Abcarian H**, Tan AB: Complications of Intestinal Stomas.  Contemp Surg, 24:5,17-23, 1984.

48.  Prasad ML, Pearl RK, Orsay CP, **Abcarian H**:  End-Loop Leo Colostomy for Massive Trauma to the Right side of the Colon.  Arch Surg, 119:975-976, 1984.

49.  Ramanujam PS, Prasad ML, **Abcarian H**, Tan AB:  Perianal Abscesses and Fistulas:  A Study of 1023 Patients.  Dis Colon Rectum, 27:593-597, 1984.

50.  Pearl RK, Prasad ML, Orsay CP, **Abcarian H**, Tan AB:  A Survey of Technical Considerations in the Construction of Intestinal Stomas.  Am Surg, 51:462-465, 1985.

51.  Pearl RK, Nelson RK, Prasad ML, **Abcarian H**, Schuller N:  Ileoanal Anastomosis Twenty-Four Years after Total Proctocolectomy for Ulcerative Colitis.  Dis Colon Rectum, 28:180, 1985.

52.  Nelson RL, Prasad ML, **Abcarian H**:  Anal Carcinoma Presenting as a Perirectal Abscess or Fistula.  Arch Surg, 120:632-635, 1985.

53.  Nicosia JF, **Abcarian H**:  Levator Syndrome:  A Treatment that Works.  Dis Colon Rectum, 28;406-408, 1985.

54.  Nelson R, **Abcarian H**:  Complications of Rectal surgery.  Surgical Rounds. 9:37-48, 1985.

55.  Abel ME, Nelson RL, Prasad ML, Pearl RK, Orsay CP, **Abcarian H**: Parasacrococcygeal Approach for the Resection of Retrorectal Developmental Cysts.  Dis Colon Rectum, 28:855-858, 1985.

56.  Pearl RK, Prasad ML, Orsay CP, **Abcarian H**, Tan AB, Melzel MT:  Early Local Complications from Intestinal Stomas.  Arch Surg, 120:1145-1147, 1985.

57.  Nehme KA, **Abcarian H**:  Colorectal Foreign Bodies:  Management Update.  Dis Colon Rectum, 28:941-944, 1985.

Herand **Abcarian**, M.D.

58.    Abel ME, Nehme KA, **Abcarian H**, Arlenga P, Barron SS:  Anorectal Neuromas.
       Dis Colon Rectum, 38;960-961, 1985.

59.    Prasad ML, Pearl RK, Nelson RL, Orsay CP, **Abcarian H**:  Perineal Proctectomy,
       Posterior Rectopexy and Postanal Levator Repair for Rectal Prolapse.  Dis Colon
       Rectum, 29:547-552, 1986.

60.    Pearl RK, Nelson RL, Prasad ML, Orsay CP, **Abcarian H**:  Serious
       Complications of Sulfasalazine.  Dis Colon Rectum, 29:201-202, 1986.

61.    Pearl RK, Monsen H, **Abcarian H**:  Surgical Anatomy of the Pelvic Autonomic
       Nerves, a Practical Approach.  Am Surg, 52:236-237, 1986.

62.    Pearl RK, Nelson RL, **Abcarian H**, Nyhus LM:  Establishing a Flexible
       Sigmoidoscopy/Colonoscopy Program for Surgical Residents:  The University of
       Illinois Experience.  Amer Surg, 52:557-580, 1986.

63.    **Abcarian H**:  Rectal Trauma.  Gastroenterol Cl N Amer, 16:115-123, 1987.

64.    **Abcarian H**:  Care of Flexible Sigmoidoscopes.  Office Procedures for Proper
       Handling and Cleansing.  Consultant, 27:51-53, 1987.

65.    Rizk S. **Abcarian H**:  Carcinoma of the Anal Canal and Perianal Region.
       *Problems in General Surgery*.  Jan-Mar, 4:130-140, 1987.

66.    Quevedo-Bonilla G, Farkas AM, **Abcarian H**, Hambrick E, Orsay CP:  Septic
       Complications of hemorrhoidal Banding.  Arch Surg, 123:650-651, 1988.

67.    Nelson TM, Pollak R, Jonasson O, **Abcarian H**:  Anatomic Variants of the Celiac,
       Superior Mesenteric, and inferior Mesenteric Arteries and Their Clinical
       References.  Clin Anat, 1:75-79, 1988.

68.    Nelson RL, Orsay CP, Pearl RK, **Abcarian H**:  The Protean Manifestations of
       Familial Polyposis Coli.  Dis Colon Rectum, 31:699-703, 1988.

69.    **Abcarian H**, Pearl RK:  Stomas.  Surg Clin N Amer, 68:1295-1305, 1988.

70.    **Abcarian H**:  Panel Discussion:  Anorectal Abscess and Fistula.  Perspectives in
       Colon and Rectal Surgery, 1:2, 27-40, 1988.

71.    **Abcarian H**, Pearl RK, Orsay CP Nelson RL, Briley SC:  Traumatic Cloaca.  Dis
       Colon Rectum, 32:783-787, 1989.

72.    Pearl RK, **Abcarian H**: Non-operative Therapy for hemorrhoids.  Infections in
       Surgery, 8:411-417, 1989.

Herand **Abcarian**, M.D.

73. Orsay CP, Merlotti G, **Abcarian H**, Pearl RK, Nanda M, Barrett J:  Colorectal Trauma.  Dis Colon Rectum, 32:188-190 1989.

74. **Abcarian H**:  United We Stand (Presidential Address).  Dis Colon Rectum, 32:1013-1015, 1989.

75. Williamson JL, Nelson RL, Orsay CP, Pearl RK, **Abcarian H**:  A Comparison of Simultaneous Longitudinal and Radial Recordings of Anal Canal Pressures.  Dis Colon Rectum, 33:201-206, 1990.

76. Pearl RK, Prasad ML, **Abcarian H**, Nelson RL, Orsay CP:  Bilateral Gluteus Maximus Transposition for Anal Incontinence.  Dis Colon Rectum, 33:21, 1990.

77. Unti JA, Orsay CP, Pearl RK, Nelson RL, Duarte B, Prasad ML, **Abcarian H**:  Rodless End-loop Stomas:  A Six Year Experience.  Dis Colon Rectum, 33:30, 1990.

78. **Abcarian H**:  The Difficult Resection in Diverticulitis.  Seminars in Colon Rectal Surg, 1:97-98, 1990.

79. Nelson RL, Subamanian K., Gasparaitis A, **Abcarian H**:  Indium 111-Labled Granulocyte Scan in the Diagnosis and Management of Acute Inflammatory Bowel Disease.  Dis Colon Rectum, 33;451-457, 1990.

80. Pearl RK, Hooks VA, **Abcarian H**, Orsay CP, Nelson RL:  Island Flap Anoplasty for the Treatment of Anal Stricture and Mucosal Ectropion.  Dis Colon Rectum, 33:581-583, 1990.

81. **Abcarian H**, Pearl RK:  A Safe Technique for Resection of Perforated Sigmoid Diverticulitis.  Dis Colon Rectum, 33:905-906, 1990.

82. Matsuda T, Tanaka H, Williams S, Hanumadass M, **Abcarian H**, Reyes H:  Reduced Fluid Volume Requirement for Resuscitation of Third-Degree Burns with High-dose Vitamin C.  J Burn Care Rehab, Vol 12, 6:525-532, 1991.

83. Unti JA, **Abcarian H**, pearl PK, Orsay CP, Nelson RL, Prasad ML, Duarte B, Leff MM, Tan AB:  Rodless End-loop Stomas:  A Seven Year Experience.  Dis Colon Rectum, 34:999-1004, 1991.

84. Pearl R, Hooks VA, **Abcarian H**:  New Operations for anal Stenosis and Mucosal Ectropion.  Perspectives in Colon Rectal Surg, 4:125-130, 1991.

85. **Abcarian H**, Pearl RK:  A Simple Technique for High Ligation for the Inferior Mesenteric Artery and Vein.  Dis colon Rectum, 32:1138, 1991.

Herand **Abcarian**, M.D.

86.  Pearl RK, **Abcarian H**:  Bilateral Gluteal Maximus Transposition.  Sem Colon Rectal Surg, 3:101-103, 1991.

87.  Nelson RL, Prasad ML, Pearl RK, **Abcarian H**:  Inverted U-Pouch Construction for Restoration of Function in Patients with Failed Straight Ileoanal Pull-Through. Dis colon Rectum, 32:1040-1042, 1991.

88.  Hoffman A, **Abcarian** H:  Six Years of Occult Blood Screening in an Urban Hospital:  Concepts, Methods, and Reflections on Approaches to Reducing Avoidable Mortality Among Black Americans.  J Natl Med Assoc, 83:994-999, 1991.

89.  Pearl RK, Prasad ML, Nelson RL, Orsay CP, **Abcarian** H:  Bilateral Gluteus Maximus Transposition for Anal Incontinence.  Dis Colon Rectum, 34:478-481, 1992.

90.  Nelson RL, Briley S, Vaz O, **Abcarian** H:  The Effect of Vagotomy on Experimental Colorectal Carcinogenesis.  J Surg Onc, 51:281-286, 1992.

91.  Ondrula DP, Nelson RL, Prasad ML, Coyle BW, **Abcarian** H:  Multifactorial Index of Preoperative Risk Factors in Colon Resections.  Dis Colon Rectum, 35:117-122, 1992.

92.  Rypins EB, Wieland J, **Abcarian** H:  How General Surgery Residents Evaluate the Residency:  Results of an Internal Review and Survey.  Current Surg, 49:390-394, 1992.

93.  **Abcarian** H:  Operative Treatment of Colorectal Cancer.  Cancer, 70:1350-1354, 1992.  (Supplement)

94.  Matsuda T, Tanka H, Shimazaki S, **Abcarian** H, Reyes H:  High-dose Vitamin C Therapy for Extensive Deep Dermal Burns.  Burns, 18(2):171, 1992.

95.  Ondrula D, Nelson RL, Andianopoulos GA, Schwartz D, **Abcarian** H, Birnbaum A, Skosey J:  Quantitative Determination of Pentane in Exhaled Air Correlates with Colonic Inflammation in the Rat Colitis Model.  Dis Colon Rectum, 36:457-462, 1993.

96.  Matsuda T, Hideharu T, Hanumadass M, Gayle R, Yuasa H, **Abcarian** H: Effects of High-dose Vitamin C Administration on Postburn Microvascular Fluid and Protein Flux.  J Burn Care Rehab, 13:560-566, 1992.

97.  Orsay CP, Kim DO, Pearl RK, **Abcarian** H:  Diversion Colitis in Patients Scheduled for Colostomy Closure.  Dis Colon Rectum, 36:366-367, 1993.

Herand **Abcarian**, M.D.

98.   Kokoszka J, Nelson RH, Swedler WI, Skosey J, **Abcarian** H:  Determination of Inflammatory Bowel Disease Activity by Breath Pentane Analysis.  Dis Colon Rectum, 36:597-601, 1993.

99.   **Abcarian** H, Arnold MW, Hartmann RF, Schoetz DJ:  Symposium:  Management of Benign Anorectal Disease.  Contemp Surg, 43:169-185, 1993.

100.  Pearl RK, Andrews JR, Orsay CP, Weismann RI, Prasad ML, Nelson RL, Cintron JR, **Abcarian** H:  Role of the Seton in the Management of Anorectal Fistulas.  Dis Colon Rectum, 36:573-579, 1993.

101.  Kokoszka J, Nelson RL, Falconio MA, **Abcarian** H:  The Treatment of Fecal Impaction with Pulsed Enhanced Evaluation.  Dis Colon Rectum, 37:161-164, 1994.

102.  **Abcarian** H, Alexander-Williams J, Christiansen J, Johansen J, Killingback M, Nelson RL, Reis-neto J:  Benign Anorectal Disease:  Definition, Characterization and Analysis of Treatment.  Amer J Gastroent, 89:182-193, 1994.

103.  Fengler SA, Nelson RL, Pearl RK, **Abcarian** H, Orsay CP:  Pull-Through Procedures Performed Months to Years After Permanent Proctectomy.  Dis Colon Rectum, 38:294-296, 1995.

104.  Orsay CP, Bass EM, Fifer B, Ramakrishnan V, **Abcarian** H:  Blood Flow in Colon Anastomotic Stricture Formation.  Dis Colon Rectum, 38:202-206, 1995.

105.  Nelson RL, **Abcarian** H, Davis FG, Persky V:  Prevalence of Benign Anorectal Disease in a Randomly Selected Population.  Dis Colon Rectum, 38:341-344, 995.

106.  Del Pino A, Nelson RL, Pearl RK, **Abcarian** H:  Island Flap Anoplasty for Treatment of Transsphincteric Fistula-In-Ano.  Dis Colon Rectum, 39:224-226, 1996.

107.  Cintron JR, Asadi FK, Malakouti A, **Abcarian** H:  Androgen Induces Ornithine Decarboxylase Gene Expression in Colonic Cell Line HT-29.  Dis Colon Rectum, 39:406-409, 1996.

108.  Nelson RL, **Abcarian** H, Nelson TM, Misumi A, Kako H, Rizk S, Sky-Peck H:  The Effect of Dietary Selenium Deficiency on Acute Colorectal Mucosal Nucleotoxicity Induced by Several Carcinogens in the Rodent.  Amer J. Surg, 172:85-88, 1996.

109.  Del Pino A, **Abcarian** H:  The Difficult Wound.  Surg Cl N Amer, 77(1):155-174., 1997.

Herand **Abcarian**, M.D.

110.    Bass EM, Del Pino A, Tan A, Pearl RK, Orsay CP, **Abcarian** H:  Does Preoperative Stoma Marking and Education by the Enterostomal Therapist Affect Outcome?  Dis Colon Rectum 40:440, 1997.

111.    Fengler SA, **Abcarian** H:  The York Mason Approach to Repair of Iatrogenic Rectourinary Fistulae.  Amer J Surg, 173:213-217, 1998.

112.    **Abcarian H**:  The Time Has Come.  Techniques in Coloproctology.  3:3-4,  1999.

113.    Cintron JR, Park JJ, Orsay CP, Pearl RK, Nelson RL, **Abcarian H**:  Repair of Fistula-in-Ano Using Autologous Fibrin Tissue Adhesive.  Dis Colon Rectum 42:5:607-613, 1999.

114.    Cintron JR, Park JJ, Orsay CP, Pearl RK, Nelson RL, Sone J, Song R, **Abcarian H**:  Repair of Anorectal Fistulae with Fibrin Sealant – Long-term Follow-up.  Dis Colon Rectum  43:994-950, 2000.

115.    Cicalese L, Sileri P, Asolati M, Rastellini C, **Abcarian H**, Benedetti E:  Low Infectious Complications in Segmental Living Related Small Bowel Transplantation in Adults.  Clinical Transplantation, 14(6):567-71, Dec 2000.

116.    Cintron JR, Song R, Park JJ, Brown S, **Abcarian H**:  Giant Anorectal Condyloma Acuminata (Buschke-Lowenstein Tumor):  Contemporary Surg, 57;1:31-35, Jan 2001.

117.    Masad MG, Kong L, Benedetti E, Resnick D, Ghosh L, Geha, A, **Abcarian H**:  Dysphagia Caused by a Fetus-in-Fetu in a 27 Year Old Man.  Ann Thoracic Surg, 71:1338-1341, 2001.

118.    Nelson R, Spitz, J, Pearl RK, **Abcarian H**:  What Role Does Full Rectal Mobilization Alone Play in the Treatment of Rectal Prolapse?  Tech Coloproctolgy 4:129-131, 2001.

119.    Benedetti E, Baum C, Cicalese L, Brown M, Raofi V, Massed MG, **Abcarian H**:  Progressive Function Adaptation of Segmental Bowel Graft from the Living Related Donor.  Transplantation.  71(4):569-71, 2001.

120.    Benedetti E. Baum C, Raofi V, Brown M, Rastellini C, Masad MG, **Abcarian H**, Cicalese L:  Living Related Small Bowel Transplantation:  Progressive Functional Adaptation of Graft.  Transplant Proceedings, 32(6):1209, 2001.

121.    Chin A, Singer M, Mihalov M, **Abcarian H**, Cintron J, et al:  Superselective Mesenteric Emobilization with Micro Coils in a Porcine Model.  Dis Colon Rectum, 44(4):A12, 2001.

Herand **Abcarian**, M.D.

122.  Cintron JR, Song R, Park JJ, Brown S, **Abcarian H**:  Giant Anorectal Condyloma Acuminata (Buschke-Lowenstein Tumor).  Contemp Surg, 57(1):31-35, 2001

123.  Cicalese L, Rastellini C, Sileri P, **Abcarian H**, Benedetti E:  Segmental Living Related Small Bowel Transplantation in Adults.  J Gastrointestinal Surg, 5(2):168-173, March 2001.

124.  Cicalese L. Baum C, Brown M, Sileri P, Smith D, **Abcarian H**, Benedetti E.  Infectious Complications Following Living Related Small Bowel Transplantation in Adults.  Transplantation Proceedings, 33(102():1554-55, Feb. 2001.

125.  Edison M, Cintron J, Horgan S, **Abcarian H**, Helton W:  Resident and Candidate Perceptions of Professional Performance Standards.  Submitted to Current Surgery.

126.  Singer M, Chaudhry V, Cintron J, Fleshman J, Spitz J, Bimbaum JE, Read T, **Abcarian H**  Early Experience with Stapled Hemorrhoidectomy in the United States.  Dis Colon Rectum, 45(3):360-7; 2002.

127.  Chin AC, Signer MA, Mihalov M, **Abcarian H**, Cintron JR, Radhakrishnan J, Lamba A, Owens CA.  Superselective mesenteric embolization with microcoils in a porcine model.  Dis Colon Rectum, 45(2):212-8, 2002.

128.  Singer MA, Cintron JR, Martz JE, Schoetz DJ, **Abcarian H**.  Retrorectal Cyst: Rare Tumor Frequently Misdiagnosed.  J Am Coll Surg 2003;196:880-886.

129.  Benedetti E, Panaro F, Holterman M, **Abcarian H**:  Surgical approaches and intestinal transplantation.  Best Pract Res Clin Gastroenterol. 17:10 17-40, 2003.

130.  Holterman MJ, Holterman AL, Carol E, **Abcarian** H, et al:  Living-related bowel transplantation to treat short bowel syndrome in a four year old child:  A case report.  J Pediatr Surg, 38(12):1763-5, 2003.

131.  Singer MA. Cintron JR. Benedetti E. Lamba A. **Abcarian H**. Hand-sewn versus stapled intestinal anastomoses in a chronically steroid-treated porcine model. *American Surgeon. 70(2):151-6; discussion 156, 2004* .

132.  Testa G, Panaro F, Schena S, Holterman M**, Abcarian H**, Benedetti E. Living related small bowel transplantation: donor surgical technique. Ann Surg. 2004 Nov;240(5):779-84.

133.  Benedetti E, Testa G, Sankary H, Sileri P, Bogetti D, Jarzembowski T, **Abcarian H.** Successful treatment of trauma-induced short bowel syndrome with early living related bowel transplantation. Journal Of Trauma-Injury Infection And Critical Care 2004;57:164-170.

Herand **Abcarian**, M.D.

134.    Benedetti E, Testa G, Holterman M, John E, **Abcarian H.**  Application of living-donor bowel transplantation to pediatric patients.  *Clin Transpl.* 2004; 19 (suppl 13): 26 (INV-134)

135.    M Singer, J Cintron, A Bastawrous, C Orsay, R Nelson, R Pearl, J Sone, **H Abcarian**.   Treatment of fistulae in ano with fibrin sealant in combination with intra-adhesive antibiotics and or surgical closure of the internal fistula opening. Dis Colon and Rectum,  2005;48:799-808R

136.    Testa G, Holterman M, John E, Kecskes S, **Abcarian H,** Benedetti E. Combined living donor liver/small bowel transplantation. Transplantation. 2005 May 27;79(10):1401-4

Herand **Abcarian**, M.D.

**BOOK CHAPTERS**

1.      Anorectal Disorders, Trauma to the Anorectum.  In *Sexually Transmitted Disease*, Ostrow D, Sandholzer TM, Felman YM, eds, Plenum Medical Book Company, New York, 1983, pp 141-158.

2.      Surgical Treatment of Anorectal Diseases:  Hemorrhoids, Fissures, Abscesses and Fistulas.  In *Mastery of Surgery*, Nyhus LM, Baker JR eds, Little, Brown and Co., Boston/Toronto, 1984, pp1054-1060.

3.      Complications of Colon and Rectal Trauma.  In *Complication of Colon and Rectal Surgery*,  Ray J, Gathright JB, Ferrari B eds, WB Saunders, Philadelphia, 1985, pp 143-155.

4.      Lower Gastrointestinal Endoscopy.  In *Surgical Disorders*, Sigel B ed, Lea and Febiger, Philadelphia, 1986, pp 275-282.

5.      Anal Stricture (Stenosis).  In *Current Surgical Therapy –2*, Cameron J ed, BC Becker , Inc, CV Mosby , Toronto, 1986 pp. 139-143.

6.      Proctosigmoidoscopy In *Manual of Gastrointestinal Endoscopy for Surgeons*, Pearl R, Editor, Little Brown and Company, Boston/Toronto, 1985, pp. 145-164.

7.      Treatment of Hemorrhoids In *Current Surgical Therapy – 3*, Cameron JL, Editor, C.V. Mosby Company, 1988, pp. 171-173.

8.      Colonoscopy vs. Sigmoidoscopy In *Current Surgical Therapy – 3*, Cameron JL, Editor, C.V. Mosby Company, 1988, pp. 388-391.

9.      Rectal Trauma  In *Current Therapy in Colon and Rectal Surgery*, Fazio VW, Editor, BC Decker Inc., 1990, pp. 102-105.

10.     **Abcarian H**, Dodi G, Griona J, Kronborg O, Parnaud E, Thomson JPS, Vaifai M, Moderator:  JC Goliger:  Fistula-In-Ano.  Topics In *Colorectal Disease*, Nicolls RJ, Mortensen N, Northover J, Editors, Springer Verlag, 1991, pp 1-21.

11.     **Abcarian H**, Saclarides TJ, Mosnier H:  The Role of Endosonography in the Management of Patients with Rectal Cancer.  In *Adjuncts to Cancer Surgery*, Economou SG, Witt TR, Deziel DJ, Saclarides TJ, Staren ED, Bines SD, Editors, Lea & Febiger, 1991, pp. 73-78.

12.     Pearl RK, Hooks III VH, **Abcarian H**:  New Operations for Anal Stenosis and Mucosal Ectropion.  In *Perspectives in Colon and Rectal Surgery*, Schrock TR, Editor, Quality Medical Publishing, Inc., 1991, Vol 4, No. 1, pp. 125-130.

Herand **Abcarian**, M.D.

13. Pearl RK, **Abcarian H**:  Diverting Stomas.  In *Intestinal Stomas – Principles, Techniques, and Management*. MacKeigan JM, Catalado P, Editors, Quality Medical Publishing, Inc., St. Louis, MO, 1993, pp. 157-169.

14. **Abcarian H**, Gordon PH, Kodner IJ (Panelists), Gathright JB (Moderator):   Anal Fistulas – Expert Exchange.  In *Perspectives in Colon and Rectal Surgery*, Schrock TR, Editor, Quality Medical Publishing, Inc., St. Louis, MO, 1993, pp. 157-169.

15. Nelson RL, **Abcarian H**:  Pattern of Disease, Staging and Therapeutic Implications in Patients with Colorectal Cancer.  In *Colorectal Cancer*, Wanebo H, Editor, Mosby-Yearbook, 1993.

16. The "Lay-Open" Technique.  In *Anal Fistula*.  Philips R, Editor, Chapman Hill Publishers, London England, 1994.

17. **Abcarian H**, Pearl RK:  Anorectal Fistulas:  Role of Seton.  In *Current Therapy*, Cameron JL, Editor, Mosby-Yearbook Publishers, St. Louis, Mo, 5th Ed, 1995, p. 228-232.

18. Epidermoid Cancer of the Colon.  A Nonsurgical Disease for the Most Park.  In *Tumor Board Case Management*.   Winchester DP, Brennan MF, Dodd Jr GD, Henson ED, Kennedy BJ, Steele Jr GD, Wilson JF, Editors, Lippincott-Raven, Philadelphia, 1997, pp. 265-269.

19. Del Pino A, **Abcarian H**:  Colovesical Fistulas.  In *Diverticular Disease: Management of the Difficult Surgical Case.* Welch JP, Cohen JL, Sardella WV, Vignati PV, Editors, Williams and Wilkins, Baltimore, MD, 1998, pp. 151-166.

20. Acute Diverticulitis Operative Management.  In  *Crucial Controversies in Surgery*, Schein M, Editor, Lippincott-Raven, Philadelphia, 1998.

21. Anal Fissure and Fistula.  In The Practice of General Surgery, K.I. Bland Editor, W.B. Sanders Company, Philadelphia, 2001, pp. 515-520.

22. Cintron JR, **Abcarian H**: Reoperative Surgery for Recurrent Pilonidal Disease. Longo W Editor, Reoperative Colon and Rectal Surgery, 1st ed in press.

23. Benedetti E, Panaro F, Holterman M, **Abcarian H**:  Surgical Approaches and Intestinal Transplantation.  In Best Practice and Research:  *Clinical Gastroenterology*.  Tytgat Editor, Thomson Guest Editor, Elsevier Ltd, New York, NY  2003.

24. Pearl RK, Bastawrous AL, **Abcarian H**:  Diverting Stomas.  In Intestinal Stomas: Principles, Techniques, and Management.  2nd ed., GCataldo and MacKeigan Editors, Marcel Dekker, Inc, New York, 2004.

Herand **Abcarian**, M.D.


25.     Cintron J, **Abcarian H**. Hemorrhoids. Editors: Fleshman, Wolff, Beck, Pemberton, Wexner,  The ASCRS Textbook of Colon and Rectal Surgery, Springer-Verlag, New York, Inc., 2005 (in press)

*Revised 6/12/96*

FILE COPY

UNIVERSITY OF ILLINOIS

COLLEGE OF MEDICINE AT CHICAGO

MEDICAL SERVICE PLAN BY-LAWS

08CV3843
JUDGE DER-YEGHIAYAN
MAGISTRATE JUDGE NOLAN
JH

## I. Preamble.

In order to further the teaching, research and public service missions of the University of Illinois, and pursuant to the authority granted to it by Chapter 110 Illinois Compiled Statutes, Section 330/5, these Medical Service Plan (the "MSP") By-Laws (the "By-Laws") for the University of Illinois College of Medicine at Chicago (the "College") are hereby adopted, for the purpose of establishing the procedures under which the faculty shall establish: (1) the manner in which professional fees shall be charged and (2) the manner in which any charges so collected shall be disbursed. These By-Laws shall be administered and interpreted consistent with the attainment of the following goals:

A. To provide an optimum setting in which faculty physicians can practice their clinical skills, thereby furthering the clinical education programs of the College;

B. To provide funds for the compensation and fringe benefits necessary to attract and retain College faculty of the highest professional caliber;

C. To contribute to the academic enrichment of the educational and research programs of the Department and the College;

D. To support clinical faculty practice and provide a forum for discussion of practice issues;

E. To provide a formal structure to represent the clinical faculty and advise the UIC Medical Center on development of health care delivery systems with joint risk-sharing capabilities;

F. To enable clinical faculty practices to respond quickly to the competitive marketplace and growth in managed care by providing for a structure for effective decision-making;

G. To provide a clinical practice structure that will encourage physician entrepreneurship while fostering agreement among departments regarding development of a clinical practice strategy;

H. To foster and provide a vehicle for the expansion of primary care and development of alliances with other health care providers, ensuring successful

1



EXHIBIT

B

participation in managed care and protecting and enhancing the clinical practices' patient base; and

I.    To provide in conjunction with the UIC Medical Center shared administrative services, including planning and marketing, managed care, and other business functions.

## II. Definitions

A.    "University" means the Board of Trustees of the University of Illinois.

B.    "UIC Medical Center" means any hospital, institute, clinic, out-patient department, or office owned or leased by the University, at which a University Health Care Program is conducted.

C.    "University Health Care Program" means a patient diagnostic, treatment, or care program, service, or activity conducted by the University through its personnel it assigns to such public service functions.

D.    "College" means the University of Illinois College of Medicine at Chicago.

E.    "Department" means a clinical department of the College.

F.    "By-Laws" means these University of Illinois College of Medicine at Chicago By-Laws.

G.    "Master Plan" means the Medical Service Plan for the College.

H.    "Department Plan" means the Medical Service Plan developed for each clinical Department of the College and established by Subordinate By-Laws.

I.    "Academic Department Head" means the individual appointed Head of the Department by the University.

J.    "Full-time Faculty" means a position on the faculty of the college as a full-time employee of the University of Illinois, and/or VA Westside Medical Center, or as a full-time employee of the University and any hospital with which the College has an affiliation agreement stating that such employees shall be members of the faculty and MSP of the College.

K.    "Full Member" shall mean an individual who is a member of the Plan pursuant to Article III, Section A (1) of this Plan.

L.    "Associate Member" shall mean an individual who is an associate member of the Plan pursuant to Article III A (2) of the Plan.

M.    "Affiliate Member" shall mean an individual who is an Affiliate Member pursuant to Article III A (3).

N.    "Professional Fees" shall mean all fees for patient care or other professional services rendered by Full Members, regardless of the place where such services

are rendered, and fees for patient care or other professional services rendered by Associate Members and Affiliate Members at the UIC Medical Center, or otherwise within the scope of their employment by the College, but shall not include compensation paid by the College or the VA, royalties, retainers or other fees for scientific or expert witness advice, fees for editing publications and honoraria. Fees generated by Associate Members in other than the UIC Medical Center may be excluded at the discretion of the Department Head.

III. Membership: Rights and Obligations of Members.

    A.    Membership as a Condition of Employment. As a condition of their employment or other affiliation with the College:

        1.    Full Members shall be all full-time faculty who must, upon acceptance of such appointment, be bound by the terms of these By-Laws

        2.    Associate Members of MSP are persons who do not meet the criteria for Full-time Faculty set forth in Article II, Section J of these By-Laws but who receive compensation from and render professional services through the University at a level of 50% or greater appointment or have MSP billings greater than $50,000 for clinical professional services during the previous fiscal year. Associate Members are bound by the terms and conditions of these By-Laws.

        3.    Affiliate Members are persons who are less than 50% appointment and who have MSP billings less than $50,000 during the previous fiscal year.

        4.    The dollar amount in paragraphs 2 and 3 above may be adjusted by the Board of Directors and the Dean on an annual basis.

    B.    Voting. Full Members and Associate Members shall have full voting privileges.

    C.    Staff Privileges. All Full Members shall be members of the medical staff of the UIC Medical Center or a COM affiliated hospital. Associate Members and Affiliate Members must be on the staff of UIC Medical Center or a COM affiliated hospital. No Full Member shall be a member of the medical staff of any other non-affiliated hospital or medical center except with the written consent of the Dean of the College.

    D.    Patient Care and Other Professional Income. No Full Member shall charge or collect any Professional Fees, directly or indirectly, for an account outside of the MSP. All such fees shall be billed through or on behalf of the Plan and all

funds collected in respect of such billings shall be deposited in appropriate accounts in the University's treasury, all as provided in Article IV thereof.

E.      Department Heads. Individual Department Heads must be Full Time Faculty Members and all professional fees billed and generated by them or on their behalf shall be collected through the University Medical Service Plan and distributed to the University and the Department in accordance with these By-Laws.

F.      Compensation. The compensation of the Members shall be as recommended by the Department Head in accordance with the departmental plan subject to the approval of the Dean of the College, as provided in Article V hereof and in compliance with University Statutes, Rules and Policies.

## IV. Professional Fees.

A.      Amount of Fees. The amount of Professional Fees or other Professional charges shall be determined according to schedules or other arrangements established by the Departmental Plan subject to the authority of the Medical Service Plan Board of Directors.

B.      Billing and Collection. All Professional Fees shall be billed and collected in the name of the Plan. The Department Head shall determine the manner in which the Plan shall bill and collect Professional Fees, including, but not limited to, the determination of the personnel and procedures to be used in carrying out such functions, subject to the authority of the Medical Service Plan Board of Directors. The Department's billing and collection procedures shall be subject to the following rules:

1.      The costs of billing and collection shall be paid solely out of Professional Fees collected, and shall not be paid from other University funds which may be available to the Department.

2.      The Department Plan shall be liable and accountable for any adverse settlements with third-party payors, such as Blue Cross/Blue Shield, Medicare, and Medicaid.

C.      Accounts and Accounting. All funds received under the Plan in respect of Professional Fees shall be accounted for in the manner described below.

1.      As of the effective date of these By-Laws, there shall be established in the treasury of the University an account designated the "University of Illinois College of Medicine Medical Service Plan, the Department General Account" (the "General Account").

2.  All funds received under the Plan in respect of Professional Fees shall be deposited in such account. The disbursement of funds deposited in the Department General Account shall be under the exclusive supervision and control of the Department Head in accordance with the Departmental Plan and any other persons to whom the Department Head shall properly delegate such authority, subject to the provisions of these By-Laws and the authority of the Medical Service Plan Board of Directors.

3.  All expenses incurred by the University, whether in its name or in the names of the College, the Department or the Plan in connection with activities which generate or are related to Professional Fees, other than Members' compensation, shall be a liability of the General Account and payable therefrom before the payment of any other expenditures. Such expenses shall include, but not be limited to premiums for or contributions toward professional liability coverage of Full Members, Associate Members, Affiliate Members and other personnel of the Department pursuant to the University Self Insurance Plan; compensation for services performed by personnel engaged in support of the patient care activities of the Department, to the extent that such compensation is not otherwise payable by the University; costs of billing and collecting Professional Fees, whether payable to the University or to an outside agency; "Faculty Base Salaries" as in Article V below and fringe benefits related thereto; legal fees incurred by the Office of University Counsel; and other consulting expenses.

4.  As soon as practicable after the end of each quarter, the Department shall cause to be calculated the gross receipts recorded in the Department General Account since the end of the preceding quarter. These shall be referred to as "Gross Professional Fees." Immediately upon the determination of the Gross Professional Fees, the Department Head shall cause the disbursement of (i) an amount equal to no less than 10% of the Gross Professional Fees less the cost of professional liability coverage and billing and collection related expenses to an account maintained in the University treasury designated by the Dean of the College for such purpose (the "Dean's Account"), and (ii) an amount no less than 10% of the Gross Professional Fees less the cost of professional liability coverage and billing and collection related

5

expenses to an account maintained in the University treasury designated by the Department (the "Department Head's Account"). The minimum percentages allocated to these accounts may be adjusted from time to time by the Board of Directors of the MSP. Funds held in the Dean's Account and the Department Head's Account shall be used, in the sole discretion of the Dean of the College or the Department Head, as the case may be, to further the research, educational and patient care activities of the College and the Department, respectively.

5.  Any amount remaining in the General Account after the payment of the expenses described in paragraph 3 above and the disbursements described in paragraph 4 above shall be available for disbursement at such time or times as determined by the Department Head in support of the patient care, educational and research activities of the Department, including the payment of "Variable MSP Compensation" and the fringe benefits related thereto as defined in Article V below to the Full Members, and Associate Members and Affiliate Members of the Department.

6.  All the above-described accounts shall be credited with interest income based on the account fund balance. All earnings attributable to amounts held in any of the above-described accounts shall be credited to and deposited in such accounts not less frequently than once every three months. Any balances in such accounts as of the end of a fiscal year of the Plan shall remain in such accounts and be carried over to the succeeding year.

7.  Notwithstanding anything contained in the Plan to the contrary, no accounts shall be expended or disbursed from the Department General Account to the extent that after such expenditure or disbursement the Department General Account would show a negative balance. If the Department Head shall determine that the payment of expenses described in paragraph 3 above for any three month period would cause the General Account to show a negative balance, he or she shall cause the amount of the anticipated deficit to be transferred from the Department Head's Account to the extent thereof. If after such transfer the Department Head shall determine that the payment of expenses described in paragraph 3 above would still cause the General Account to show a negative balance, he or she shall promptly inform the Dean

of the College of such determination. The Dean of the College shall determine the appropriate action to be taken, which may include any one or more of the following actions: (1) a change in the Faculty Salaries of the Full Members, Associate and Affiliate Members of that Department the following fiscal year provided that any such reduction shall be made pro rata in respect of all Full Members, Associate Members and Affiliate Members. (2) the transfer to the General Account of funds from the Dean's Account. Any such reductions or transfers shall be restored from the General Account prior to the payment of any Variable Compensation. During any period beginning with the Department Head's notification to the Dean of the College that the General Account will show a negative balance and ending upon the restoration of any salary reductions or fund transfers as described above, the billing and collection of Professional Fees and the disbursement of funds held in the General Account shall be under the exclusive supervision and control of the Dean of the College.

8. The Department shall keep all its books and records, according to generally accepted accounting practices and applicable University guidelines. Summaries of the activities of the General and Department Head's Accounts shall be provided to the Dean of the College at least once every three months. The Dean of the College shall be entitled to inspect the accounts of the Department at any time. The accounts of the Department shall also be made available for review by other University officials authorized by the Dean.

D. Annual Budget. During the University's annual budget process the Dean shall direct the Department Head to prepare and submit to the Dean of the College for approval a financial budget for the Department Plan covering the next academic year. Such budget shall reflect anticipated Gross Professional Fees, expenses, transfers to the Dean's Account and the Department Head's account and all faculty compensation.

## V. Compensation of Members, Associate Members, and Affiliate Members.

The compensation of Full Members, Associate Members, and Affiliate Members shall be paid by either of the following two payment methods or some combination of both.

A. Faculty Base Salary. The "Faculty Base Salary" of a Full Member or an Associate Member or an Affiliate Member shall be a fixed annual total amount

7

of compensation which may include one or more components as determined by the Department Head, subject to the approval of the Dean prior to the beginning of each academic year and included in the Department Budget prepared pursuant to Article IV. Faculty Base Salary shall be paid in twelve equal installments. Faculty Base Salary shall be treated as remuneration for services performed by the recipient as an employee of the University for all purposes, including participation in any University or College retirement or fringe benefit plans or programs and the University's responsibility to withhold, report and pay federal income and employment taxes.

B.     Variable Compensation. The "Variable Compensation" of a Full Member, Associate Member, Affiliate Member or other departmental health care provider shall be an amount determined by the Departmental Plan based upon the Net Professional Fees [the Gross Professional Fees less expenses and payments pursuant to Article IV, Section C (3) & (4)], earned by the Members of the Department during a fiscal year of the Plan. Payments of Variable Compensation shall be made no more often than at the end of each academic quarter. Notwithstanding anything to the contrary, the liability of the University to pay Variable Compensation to any Member or Associate Member shall be limited to the assets of the Department General Account after payment of expenses described in Article IV C (3) above and the disbursements described in Article IV C (4). Variable Compensation shall be treated as remuneration for services performed by the recipient as an employee of the University for all purposes, including participation in any University or College retirement or fringe benefit plans or programs and the university's responsibility to withhold, report and pay federal income and employment taxes.

VI.   **Medical Service Plan - Board of Directors.**

A.     The College shall establish a Board of Directors of MSP. The Board of Directors shall be constituted in the following manner.

1.     All Clinical Department Heads.

2.     An elected member representative from each of the clinical departments who is not the department head. The department representative must be a voting member of MSP and is to be selected by a majority vote of the Departmental Full members and Associate Members for a term of two years.

8

3.   Dean of the College of Medicine, the Vice Dean, the UICH Director, and an MSP Executive Director.* Others may attend Board meetings at the discretion of the Board.

B.   The Board of Directors of the MSP in addition to performing the duties herein provided, may be called upon to advise the Dean of the College, the UIC Vice Chancellor for Health Services or the UIC Chancellor, as to recommended changes in the Plan. The Board of Directors shall have the right to review any changes proposed in the Plan by the Dean of the College, the UIC Vice Chancellor for Health Services or the UIC Chancellor prior to the referral of such changes to the University. The Board of Directors shall have the following authority and responsibilities:

1.   To support clinical faculty practice and provide a forum for discussion of practice issues.

2.   To represent the clinical faculty and to advise the UIC Medical Center on development of health care delivery systems with joint risk-sharing capabilities.

3.   To provide and approve, in conjunction with the UIC Medical Center, shared administrative services, including planning, marketing, managed care, and other business functions.

4.   To represent the clinical faculty and advise the UIC Medical Center on strategic planning for UIC clinical practices.

5.   To review and approve all managed care and patient care contracts.

6.   To advise the UIC Medical Center on the operations and management of ambulatory care programs.

7.   To assess Departmental MSP accounts based on an annual budget approved by the Board of Directors to support the cost of shared group practice expenses and the cost of group practice development.

8.   To manage the distribution of MSP funds from capitated managed care contracts.

9.   To approve all MSP fee schedules.

10.  To recommend distribution methodologies for clinical faculty variable compensation.

11.  To review and approve all Departmental MSP Plans.

C.   A majority of the voting members of the Board of Directors as constituted from time to time shall constitute a quorum, and any action approved by the

---

* Each shall be ex-officio members without vote.

majority of the members of the Board of Directors present at any meeting in person shall constitute the action of the Board of Directors. Each member of the Board of Directors shall be entitled to one vote.

D.    The Dean shall be Chair of the Board of Directors and shall, in addition to performing the usual duties of the Chair, sign all reports and endorsements required of the Board of Directors. The Vice Dean shall be Vice-Chair. In the absence of the Chair, the Vice-Chair shall perform the duties of the Chair.

E.    The Board may establish committees to carry out day-to-day business as well as specific tasks as required. The membership, roles and responsibilities of such committees shall be determined by the Board.

## VII. Departmental MSP Plans.

A.    All Departmental MSP plans must conform to the following rules and regulations and are subject to approval by the Board of Directors.

    1.    The Departmental Plan shall consider among other factors tenure, academic rank, years of service and academic and/or clinical productivity to be applied in the determination of the amount of base salary.

    2.    The selection of members for the Departmental MSP Committee shall be by majority vote of Full Members and Associate Members of the Department.

    3.    The Departmental MSP Committee chairman shall be the Department Head.

## VIII. Members' Meetings.

A.    Annual Meeting:

    1.    There shall be an annual meeting held on a date determined by the Board of Directors of each year.

B.    Special Meetings:

Special meetings of MSP participants may be convened by the Chair of the Board of Directors at any time. Special meetings may also be convened with not less than seven business days' prior notice at the request of:

    1.    A majority of the Clinical Department Heads,

    2.    The Dean, or

    3.    at least 10% of the Members.

IX. **Amendments.**

    A.    These By-Laws and any subsequent amendments will be presented in writing to the members at least ten (10) days before a vote is conducted. Ratification of these By-Laws and approval of any amendments shall require a two-thirds majority of those members voting. Such vote may be taken at the annual meeting or at a special meeting.

    B.    These By-Laws and any subsequent amendments and each Departmental Plan shall not be effective unless approved by the University.

    C.    These By-Laws shall become effective upon approval of the University and shall take effect on the first contract year following such approval. (September 1, 1995)

X. **Termination.**

    Upon termination of employment by the University, the Plan may continue to bill and to collect for services rendered by a Full Member, Associate Member, or Affiliate Member who will no longer receive income derived from these services. Terminating members have no ownership rights in accounts receivable or work in process.

## RELEASE AND INDEMNITY AGREEMENT

For and in consideration of the sum of Nine Hundred Fifty Thousand Dollars ($950,000.00) I, David Behzad, Individually and as Independent Administrator of the Estate of John J. Behzad, Deceased, do hereby release, acquit and forever discharge The Board of Trustees of the University of Illinois, its' employees, agents, servants, and students, their heirs, executors, administrators and assigns, of and from any and all actions, claims, demands, damages, costs, expenses and compensation on account of, or in any way growing out of, injuries claimed to have been sustained on or about June 7, 2003 through and including February 4, 2005.

It is further understood and agreed that this is a full and complete release for all injuries and damages which the undersigned claims to have sustained or will sustain by reason of the above, whether said damages are now known or hereafter become known, including all present damages and all future developments therefrom.

The undersigned does hereby agree to defend, protect, indemnify and hold harmless The Board of Trustees of the University of Illinois, its' employees, agents, servants, and students, their heirs, executors, administrators and assigns if any person, firm or corporation shall assert or attempt to assert any claim or lien by reason of the foregoing matters, including an action by Medicare or Medicaid in connection with any Medicare or Medicaid lien.

It is further understood that this settlement is in compromise of a doubtful and disputed claim and that the payment of the above is not to be construed as an admission of liability on the part of the Board of Trustees of the University of Illinois by

EXHIBIT

C

whom liability is expressly denied.  This release contains the entire agreement between the parties hereto, and the terms of this release are contractual and not a mere recital.

I further state that I have carefully read the foregoing release and know the Contents thereof, and that I sign the same as my own free act and deed.

_David Behzad_
David Behzad

_Witness_
Witness

_6 - 13 - 2006_
Date

_1/13/2006_
Date

08CV3843
JUDGE DER-YEGHIAYAN
MAGISTRATE JUDGE NOLAN
JH

May 2, 2007

B. Joseph White, Ph.D.
President
University of Illinois
410 Administrative Office Building
1737 West Polk Street
Chicago, Illinois 60612

B. Joseph White, Ph.D.
President
University of Illinois
364 Henry Administration Bldg. MC 346
506 South Wright Street
Urbana, Illinois 61801

Lawrence C. Eppley, Esq.
Chairman of the Board of Trustees of the
University of Illinois
c/o Bell Boyd & Lloyd LLP
70 W Madison Street 33rd Floor
Chicago, IL 60602-4252

Devon Bruce, Esq.
Chairman, Legal Affairs Committee
Board of Trustees of University of Illinois
c/o Power, Rogers & Smith, P.C.
70 West Madison Street, 55th Floor
Chicago, IL 60602-4252

**Re: Herand Abcarian, M.D.**
**Appeal of Freedom of Information Act Request Denial**
**Potential wrong-doing involving University Counsel's Office**

Gentlemen:

I represent Herand Abcarian, M.D. who holds the Turi Josefsen Chair of Surgery at the College of Medicine of the University of Illinois. Dr. Abcarian has been a faculty member in the College of Medicine and its predecessor, the Abraham Lincoln School of Medicine, since 1972 – a period of 35 years and was Chair of the Department of Surgery for 15 years. The purpose of this letter is to institute a Freedom of Information Act appeal. I am taking the unusual step of notifying the Board of Trustees directly and the Chairman of the Legal Affairs Committee directly since there appear to be serious issues regarding the conduct of the Office of University Counsel. It seems at least possible that, had this letter not been addressed directly to the interested members of the Board of Trustees, these issues might not have reached the appropriate persons.

On June 13, 2006, a complaint alleging medical malpractice was filed against Dr. Abcarian in the Circuit Court of Cook County, Illinois which was very hastily settled by the Claims Management section of the Office of University Counsel on July 6, 2007 and the case was dismissed. This was done with the apparent knowledge and approval of the General Counsel who recommended to President White and the Board of Trustees



B. Joseph White, Ph.D.
Lawrence C. Eppley, Esq.
Devon Bruce, Esq.
May 2, 2007
Page Two

settlement of the claim in the in the sum of $ 950,000.00 and such approval was given. Oddly, the approval of the Board of Trustees came on July 13, 2006, after the case had been settled by the Office of Counsel and Plaintiff had dismissed the case. Dr. Abcarian was the sole defendant in the lawsuit. He was never served with the summons and complaint in part because no summons had ever been placed with the Sheriff for service and Dr. Abcarian was totally unaware that any lawsuit had been filed against him or even that settlement of the claim was being contemplated. The settlement was made within days of the lawsuit having been filed and was made without Dr. Abcarian's knowledge or consent. University officials then reported the settlement of the claim against Dr. Abcarian to the Illinois Department of Professional Regulation as a settlement of a malpractice claim. Dr. Abcarian's first knowledge of this came when he was directed by the Illinois Department of Professional Regulation to respond to its investigation concerning the facts and circumstances of the claim and settlement, a process which places Dr. Abcarian's license to practice medicine under review by the Department of Professional Regulation. The settlement was also reported by University officials to the National Practitioner Data Bank and this report also has adverse effects upon Dr. Abcarian and his professional reputation.

Upon Dr. Abcarian's notification by the Department of Professional Regulation that his professional conduct was being investigated, he retained me to represent him. I filed a petition to vacate the settlement and dismissal of the lawsuit so that Dr. Abcarian would have the opportunity to contest the wholly meritless claim. Outside counsel, ostensibly retained to represent the Board of Trustees, filed a petition on behalf of the Board of Trustees to intervene in the lawsuit even though the Circuit Court of Cook County has no jurisdiction to hear matters involving the Board of Trustees, even though no other defendant was named in the lawsuit, and even though the Board of Trustees has no *respondeat superior* liability for the professional acts of Dr. Abcarian allegedly at issue in the lawsuit which claimed professional negligence only. Accordingly, the Board of Trustees had no right or interest in intervening in the matter except to keep an ill-advised and non-meritorious settlement intact.

Ultimately, over the strenuous resistance of the University's outside counsel, acting presumably at the direction of Mr. Chris Mollet, and Mr. Thomas R. Bearrows, and at great expense to Dr. Abcarian, we were successful in obtaining the reinstatement of the case which had been dismissed with prejudice in order to litigate the issue of Dr. Abcarian's liability. Upon reinstatement, the attorney for the Board of Trustees abandoned the claim on behalf of the Board of Trustees which we had made for a refund of the $ 950,000.00 paid to the plaintiff, a convicted felon, currently and at the time of settlement under indictment on additional felony drug and gun charges, and the plaintiff's attorney immediately voluntarily dismissed the case with prejudice.

B. Joseph White, Ph.D.
Lawrence C. Eppley, Esq.
Devon Bruce, Esq.
May 2, 2007
Page Three

Because the known facts and circumstances strongly suggest potential wrongdoing in connection with the settlement, we have investigated this matter on behalf of Dr. Abcarian as thoroughly as possible in an effort to learn what prompted the actions of University employees to impugn Dr. Abcarian's good name and spotless professional reputation while at the same time caused the Office of Counsel to waste almost a million dollars of the University's money on the settlement of a case that has no merit. As part of that investigation, on March 19, 2007, Dr. Abcarian requested records with respect to any other physician employed by the University of Illinois concerning whom a report of settlement of a medical malpractice case had been made by the University to the Illinois Department of Professional Regulation. That request was made pursuant to the Illinois Freedom of Information Act. A copy of that request is enclosed. That request was denied on April 2, 2007 in part on the basis that it required the release of information which would constitute a clearly unwarranted invasion of personal privacy. A copy of the denial is enclosed. Dr. Abcarian then made an additional request on April 9, 2007 not for the names of any physician who has been reported to the Illinois Department of Professional Regulation but rather for *information* whether any other physician had been reported. This request was denied with a letter dated April 23, 2007 claiming that the second request did not fall within the Freedom of Information Act since it was not seeking records but rather required the creation of a record. Apparently, the Freedom of Information Officer, despite her title, construes her position to be the Freedom of Records Officer. Copies of the second request and the letter of denial are enclosed. Of course, it is my suspicion that the Freedom of Information Act Officer who denied Dr. Abcarian's request takes her cues from the Office of Counsel which clearly has assumed an adversarial position regarding Dr. Abcarian, rather than attempting to rectify the situation it created by the secret and un-consented to settlement of the claim against Dr. Abcarian. The actions of the Office of University Counsel in settling a non-meritorious claim, in strenuously resisting efforts to rectify the error and in abandoning the nearly one million dollars paid are essentially inexplicable unless one postulates serious wrongdoing on the part of involved persons.

On behalf of Dr. Abcarian, we appeal the denial of both requests. There is at least an issue as to whether the denial of the Freedom of Information Act requests is part of a continuing pattern of wrongdoing in connection with the settlement of the meritless claim against Dr. Abcarian and the efforts by certain University officials to cover-up such conduct. Additionally, there is at least an issue as to whether the involved persons at the Office of Counsel, whoever they are, may be guilty of serious misconduct by seeking to deny Dr. Abcarian his fundamental right to contest the claim and apparently by improperly directing the reporting of the wrongful settlement of the non-meritorious

B. Joseph White, Ph.D.
Lawrence C. Eppley, Esq.
Devon Bruce, Esq.
May 2, 2007
Page Four

medical malpractice claim to the Department of Professional Regulation and the National
Practitioner Data Bank, should those be the facts.

The underlying medical malpractice lawsuit was without legal or factual basis and was a
case where clearly no settlement was warranted. A review of the matter will show that the
suit was not filed in conformance to legal requirements as to the standing of Plaintiff, the
affidavit of merit was completely improper and, as far as we have been able to determine,
the University Counsel's Office neither addressed the issue of alleged proximate cause
nor incorporated into their review of the claim Dr. Abcarian's version of the events. Also
as far as we have been able to determine, the claim against Dr. Abcarian may be the *only*
claim against a physician employed by the University to be reported to the Department in
recent memory or perhaps ever. For example, we know that the physician involved in the
case of Julius Izquierdo was not reported to the Department of Professional Regulation
even though the Board of Trustees approved settlement of that claim in the amount of
$6,750,000.00 at approximately the same time as the settlement of the claim against Dr.
Abcarian.

Legal Argument:

STATE RECORDS ARE OPEN TO PUBLIC SCRUTINY

In *Southern Illinoisan v. Illinois Dept. of Public Health*, 218 Ill.2d 390, 844 N.E.2d 1,
300 Ill.Dec. 329 (2006) the Illinois Supreme Court held:

"The "purpose of the FOIA is to open governmental records to the light of public scrutiny."
*Bowie v. Evanston Community Consolidated School District No. 65*, 128 Ill.2d 373, 378, 131
Ill.Dec. 182, 538 N.E.2d 557 (1989).    Accordingly, under the FOIA, "public records are
presumed to be open and accessible." *Lieber v. Board of Trustees of Southern Illinois University*,
176 Ill.2d 401, 407, 223 Ill.Dec. 641, 680 N.E.2d 374 (1997); see also *Illinois Education Ass'n
v. Illinois State Board of Education*, 204 Ill.2d 456, 462-63, 274 Ill.Dec. 430, 791 N.E.2d 522
(2003).   This legislative intent is set forth by the General Assembly in section 1 of the FOIA:
"Pursuant to the fundamental philosophy of the American constitutional form of government, it is
declared to be the public policy of the State of Illinois that all persons are entitled to full and
complete information regarding the affairs of government and the official acts and policies of
those who represent them as public officials and public employees consistent with the terms of
this Act.

***

"Based upon the legislature's clear expression of public policy and intent set forth in section 1 of
the FOIA that the purpose of that Act is to provide the public with **easy access to government**

B. Joseph White, Ph.D.
Lawrence C. Eppley, Esq.
Devon Bruce, Esq.
May 2, 2007
Page Five

**information**, this court has held that the FOIA is to be accorded "liberal construction to achieve this goal." *Bowie*, 128 Ill.2d at 378, 131 Ill.Dec. 182, 538 N.E.2d 557. Accordingly, we have, on several occasions, held that the exceptions to disclosure set forth in the FOIA are to be read narrowly so as not to defeat the FOIA's intended purpose. See, *e.g., Illinois Education Ass'n,* 204 Ill.2d at 463, 274 Ill.Dec. 430, 791 N.E.2d 522; *Lieber,* 176 Ill.2d at 407, 223 Ill.Dec. 641, 680 N.E.2d 374; *American Federation of State, County & Municipal Employees (AFSCME) v. County of Cook,* 136 Ill.2d 334, 341, 144 Ill.Dec. 242, 555 N.E.2d 361 (1990). Therefore, "when a public body receives a proper **request for information**, it must comply with that request unless one of the narrow statutory exemptions set forth in section 7 of the Act applies." (emphasis added)

Accordingly, the basis principle of the law is full disclosure.

DISCLOSURE OF PERSONAL IDENTIFICATION IS NOT PROHIBITED

In *Lieber v. Board of Trustees of Southern Illinois University,* 176 Ill.2d 401, 680 N.E.2d 374, 223 Ill.Dec. 641, 119  (1997), the Illinois Supreme Court held:

"Although names and addresses are unquestionably personal in the sense that they are specific to particular persons, the statutory reference to "personal information" means more than simply that. This is apparent when one considers the provision as a whole.  For example, sections 7(1)(b)(ii) and 7(1)(b)(iii), which follow the provision at issue here, employ the same term.  They exempt from disclosure "personal information" about elected officials and licensed professionals.  If the University's construction were correct and "personal information" embraced even basic identification, the public would have no right to learn the names of officials they had placed in office, and, under this statute, a person could not confirm that the doctor who was about to perform surgery on him was actually licensed to practice medicine.  We do not believe the General Assembly intended such absurd results.

"Where the legislature intended to exempt a person's identity from disclosure, it did so explicitly. For example, the exemption in section 7(1)(b)(v) refers to "information revealing the identity" of certain persons providing information to administrative, investigative, law enforcement or penal agencies;  section 7(1)(c)(iv) speaks of the "identity of a confidential source"; and section 7(1)(u) exempts from disclosure information regarding a university's adjudication of grievance or disciplinary cases to the extent that disclosure would "reveal the identity" of the person involved. 5 ILCS 140/7(1)(b)(v), 7(1)(c)(iv), 7(1)(u) (West 1994).  Accordingly, taken in context and considering the statute as a whole, the phrase "personal information" must have been intended by the legislature to be understood not in the sense of basic identification, but in the sense of information that is "confidential" or "private."  The very purpose of section 7(1)(b), after all, is to protect "personal privacy."

Accordingly, there is no exemption which shields from disclosure records which contain the names of other physicians.

B. Joseph White, Ph.D.
Lawrence C. Eppley, Esq.
Devon Bruce, Esq.
May 2, 2007
Page Six

EVEN IF THERE WERE AN EXEMPTION FROM DISCLOSURE OF RECORDS
IDENTIFYING THE PHYSICIANS BY NAME, THE UNIVERSITY STILL WOULD
BE REQUIRED TO RELEASE REDACTED RECORDS.

In *Bowie v. Evanston Community Consol. School Dist. No. 65,* 128 Ill.2d 373, 538 N.E.2d 557,
131 Ill.Dec. 182, 53 Ed. Law Rep. 952 (1989), the Illinois Supreme Court held:

"Accordingly, where, as here, individual identifying information can be redacted and the record
scrambled, preventing a clearly unwarranted invasion of personal privacy, the record must be
disclosed.  Ill.Rev.Stat.1985, ch. 116, pars. 201, 207, 208;  see also, *e.g., Department of the Air
Force v. Rose* (1976), 425 U.S. 352, 373-77, 96 S.Ct. 1592, 1604-07, 48 L.Ed.2d 11, 28-30;
*Kryston v. Board of Education, East Ramapo Central School District* (1980), 77 A.D.2d 896,
896-97, 430 N.Y.S.2d 688, 689.

"The district, however, argues that it is under no duty to delete the sex portion of its code and
produce a record using only a race code.  A similar argument was made to and rejected by the
court in *Family Life League v. Department of Public Aid* (1986), 112 Ill.2d 449, 457-58, 98
Ill.Dec. 33, 493 N.E.2d 1054.  *Family Life* involved a suit for the disclosure of abortion providers
under the Illinois State Records Act (Ill.Rev.Stat.1985, ch. 116, par. 43.4 *et seq.*).  Like the
district here, the Department argued that because the record sought contained confidential
information it was exempt from disclosure.  The court stated that "accept[ing] this interpretation
would effectively gut the [State Records] Act.  The purpose of the Act is to open the State's
books to the light of public scrutiny.  That purpose would be totally thwarted if an entire record
could be kept closed simply by inserting minute confidential information, particularly when the
confidential information can be deleted as in the case at bar." (*Family Life,* 112 Ill.2d at 457-58,
98 Ill.Dec. 33, 493 N.E.2d 1054.)  The logic of *Family Life* is equally compelling in the FOIA
context.  See, *e.g.,* Ill.Rev.Stat.1985, ch. 116, par. 208.

"The district next asserts that to make it produce a masked and scrambled record would be
tantamount to forcing it to create a new record.  The plaintiffs argue that the masking and
scrambling of the test score record would not constitute the creation of a new record.

"We agree with the plaintiffs.  The district is not being required to prepare a "new" record.
Deleting information from a record does not create a "new" record, even if all but one or two
items of information have been deleted. (*Family Life,* 112 Ill.2d at 457-58, 98 Ill.Dec. 33, 493
N.E.2d 1054.  See also *Yeager v. Drug Enforcement Administration* (D.C.Cir.1982), 678 F.2d
315, 321.)  Similarly, scrambling a record does not lead to the creation of a "new" record.
(*Kryston,* 77 A.D.2d at 897, 430 N.Y.S.2d at 689-90;  *Seigle v. Barry* (Fla.App.1982), 422 So.2d
63, 66-67.)  The district is only being required to delete the exempt matter, protecting the
students' privacy, and disclose the nonexempt portion of the record.  Ill.Rev.Stat.1985, ch. 116,
par. 208."

B. Joseph White, Ph.D.
Lawrence C. Eppley, Esq.
Devon Bruce, Esq.
May 2, 2007
Page Seven

Accordingly, the University, at a minimum, is required to release redacted records which show whether any other physician was ever reported to the Illinois Department of Professional Regulation in connection with the settlement of a medical malpractice claim. Producing a redacted record is actually less than was involved in the issuance of the Freedom of Information Act Officer's letter of April 23, 2007 which in itself is a new record created by her with the apparent intent to evade compliance with the request.

CONCLUSION:

The University cannot have it both ways, on the one hand saying that the records are exempt from disclosure and on the other saying that it is not compelled to create a new record stating that there are no records. The University has two choices: one, produce the records; two, produce *information* that there are no records and that Dr. Abcarian has been singled out for reporting.

It is also respectfully submitted that the actions of the involved persons in the Office of Counsel be subject to carefully investigation by independent persons. In connection with such investigation, we stand ready to provide copies of all applicable court documents.

Respectfully,

O'Callaghan & Colleagues, P.C.

By:

JOSEPH MICHAEL O'CALLAGHAN

JMO/mlm
Enc.
Herand Abcarian, M.D.

08CV3843
JUDGE DER-YEGHIAYAN
MAGISTRATE JUDGE NOLAN
JH

# UNIVERSITY OF ILLINOIS

## LIABILITY SELF-INSURANCE PLAN



November 13, 2002



ARTICLE I

**Definitions**

As used herein:

1.  The term "Plan" shall mean the University of Illinois Liability Self Insurance Plan.

2.  The terms "University", "Employer", and "Board" shall mean The Board of Trustees of the University of Illinois, a body corporate and politic of the State of Illinois.

3.  The term "Injury" shall mean physical damage to or destruction of tangible property, bodily or mental injury, sickness or disease, including death, to which the Plan applies and resulted from an "occurrence" in the conduct of University business.  The term "Injury" shall not be deemed to mean intentional torts.

4.  The term "Personal Injury" means damages to which the Plan applies sustained by any person or organization and arising out of one or more of the following committed in conduct of University business.

    A.  false arrest, detention or imprisonment, or malicious prosecution

    B.  the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy

    C.  wrongful entry or eviction, or other invasion of the right of private occupancy

    D.  sexual harassment, humiliations, or discrimination

2

E.    infringement of copyright, title or slogan

F.    plagiarism, piracy, or unauthorized use of materials

G.    advertising, broadcasting, telecasting, or publishing activities

H.    unfair competition

I.    false or improper service or process

J.    violation of property rights

K.    violation of a civil or constitutional right

5.    The term "Damages" shall mean any monetary consideration approved under the Plan for payment to a claimant or the amount of a final judgment awarded to a claimant by a court of competent jurisdiction, including but not limited to money, services, and waiver of amounts payable from patients and others who receive University services, but excluding payments of back pay for service rendered, fines, monetary penalties, costs of cleaning up contaminated sites, and payments which are contrary to public policy.

6.    The term "Occurrence" shall mean any incident or accident while the Plan is in effect, including continuous or repeated exposure to conditions, which results in an "Injury" or "Personal Injury" not expected or intended from the standpoint of the covered person.

7.    The term "University Service" shall mean a service, or series of related services (including health care), performed directly for a person or organization by the University or by a member of the Board, Officer of the

3

Board, Employee or Agent of the University, while acting within the scope of his or her University duties.

8.   The term "Claimant" shall mean any person, organization, corporation or unit of government making claim against a covered person on a cause of action which resulted from an occurrence or arose out of the rendering of or failure to render University Service.

9.   The term "Covered Person" shall mean any person or organization designated in the Covered Persons provisions of the Plan.

10.  The term "Member of The Board" shall mean an individual member or former member of The Board of Trustees of the University of Illinois who at the time of an "Occurrence" or the rendering of or failure to render "University Service" was acting within the scope of his or her duties in that office.

11.  The term "Officer of the Board" shall mean a President of The Board, Secretary of The Board, Treasurer of The Board, Comptroller or University Counsel who at the time of an "Occurrence" or the rendering of or failure to render "University Service" was acting within the scope of his or her duties as such officer.

12.  The term "Vice President" shall mean the Vice President for Administration.

13.  The term "Employee" shall mean a person, who at the time of an "Occurrence", or the rendering of or failure to render "University Service," was employed by "Employer" and acting within the scope of his or her University duties.

14.  The term "Agent" shall mean any student, volunteer worker, visiting faculty or University Committee Member who at the time of an "Occurrence", or the

4

rendering of or failure to render "University Service" was acting on behalf of the University and within the scope of duties assigned by the University.

15. The term "Contracting Party" means any firm, corporation, association, unit of government or person with which the University enters into a written agreement for (i) the use of property or the performance of any function, service or act, and (ii) the allocation or sharing of liabilities and damages resulting from the performance of such agreement.

16. The term "Registered Organization" shall mean those incorporated and unincorporated student, staff and faculty organizations which have been registered with the appropriate University office in accordance with University regulations.

17. The term "Service Company" shall mean a commercial company engaged by the Employer to perform claim investigations, loss control and other services on behalf of the Plan.

18. The term "Fund" means any account or fund established by the Board for the purpose of funding expenses or claim payments incurred in the operation of the Plan.

19. The "Plan Territory" shall be anywhere in the world where the University teaches, conducts research or provides public service.

ARTICLE II

**Effective Date**

The effective date of the Plan is August 1, 1976.

ARTICLE III

## **Covered Persons**

Each of the following is a Covered Person under the Plan to the extent set forth below:

1.    The Employer

2.    Officers and Members of The Board

3.    Employees

4.    Agents

5.    Contracting Party, but only as specified by written agreement with the University

ARTICLE IV

## **Coverage Statement**

The Employer, based on the provisions of the Plan and subject to its limitations, will pay on behalf of the Covered Person all damages to which this Plan applies, which the Covered Person shall become legally obligated to pay for a claim first made while this Plan is in effect:

1.    because of injury or personal injury caused by an Occurrence, or

2.    because of injury or personal injury arising out of the rendering of or failure to render University service

The Employer shall have the right and duty to defend any suit seeking such damages against the Covered Person, even if any or all of the allegations of the suit are groundless, false or

6

fraudulent, and may make such investigation and such settlement of any claim or suit as it deems expedient, but the Employer shall not be obligated to pay any claim or judgment or to defend any suit after the applicable Plan Fund has been exhausted by payment of judgments, settlements and expenses.

In the event that any Covered Person elects to employ his own legal counsel (see Article VI below) and declines legal counsel provided by Employer, there is no obligation under the Plan to pay any sum (including judgment and legal fees) such Covered Person may become legally obligated to pay.

If the Covered Person shall refuse to consent to any settlement recommended by the Vice President and shall elect to contest the claim or continue any legal proceedings in connection with such claim, then the Plan's liability for the claim shall not exceed the lesser of the limit of Article IX or the amount for which the claim could have been settled including costs, charges and expenses incurred up to date of such refusal.

## ARTICLE V

### Exclusions

The Plan does not apply:

1. to any obligation for which the Employer or any carrier as its insurer may be held liable under any workers' compensation law, occupational diseases law, unemployment compensation law or disability benefits law, or under any similar law.

2. to any obligation for which the Employer may be held liable under any breach of contract claim or suit.

7

3.    to an obligation payable under the State Self-Insured Motor Vehicle Liability Plan.

4.    to any Occurrence, University service, or obligation which is within the provisions of the Federal Tort Claims Act as provided in 38 USC 4116 or is payable by the United States under any federal legislation or program.

5.    to the physical damage to or destruction of tangible property owned by or leased to the University.

6.    to liability assumed by a Covered Person in guaranteeing the result of any service.

7.    to liability and damages arising out of any activity of a Registered Organization.

8.    to liability and damages arising out of any activity of a Volunteer Organization unless they are a Covered Person pursuant to Article III, Section 5.

9.    to liability and damages caused intentionally or resulting from any dishonest, fraudulent, or criminal statement, act or omission.

10.   to liability and damages arising from the rendering of emergency aid and assistance not in the scope of University duties.

11.   to liability incurred by a Covered Person arising from the performance of services for fees, compensation, or profit which are derived or intended to be derived from a source other than the Employer.

12.   to liability and damages arising from the failure of corporate stock to perform as represented by a Covered Person or arising from the investment or non-investment of funds.

8

13. to liability and damages assumed by a Member or Officer of the Board, Employee, Agent, or Contracting Party under any contract.

14. to liability, damages or financial obligations arising under any law, regulation, administrative order or court order for the cleanup of a landfill or other contaminated site.

## ARTICLE VI

### Legal Services

The furnishing of all legal services, including investigations, claim management and legal defense, shall be the responsibility of the Employer through its University Counsel provided the Covered Person delivers summons and complaint to the University Counsel no later than 15 days after service of process. Required legal services may be provided by the University Counsel and his staff, or by outside legal counsel or a "Service Company" as the University Counsel deems necessary.

In the event that the Covered Person elects to employ his own legal counsel to assist the University Counsel or counsel hired by the University Counsel such employment of legal counsel shall be at the personal expense of the Covered Person, and Employer and its University Counsel shall retain the right to make all decisions in regard to the defense of the claim or suit.

ARTICLE VII

**Claims Adjustment**

The Vice President, with advice of University Counsel, is
responsible for the claim payments, denials, and settlements.
Payments for settlements from Plan Funds, which exceed the
Vice President's authorization established by The Board,
shall be submitted to The Board for prior approval. The Vice
President may utilize a "Service Company" in addition to
University personnel in performing his responsibilities.

ARTICLE VIII

**Payment of Claims and Suits**

Claims arising from operations of the University hospital,
clinics, infirmaries and dispensaries are payable from the
Hospital Professional and General Liability Fund.
Professional liability claims against Covered Persons who are
involved in the medical care of people are payable from the
Medical Professional Liability Fund. Other professional
liability claims and general liability claims are payable from
the Public Liability Fund. Claims for violation of civil and
constitutional rights are payable from the Board Legal
Liability Fund.

Moneys may be transferred between the Funds as may be
necessary for the payment of claims which are payable from
any Fund.

If the balance of the Plan Funds is not sufficient to pay all
expenses, final judgments and executed settlements, claim
payments will be made in the order that final judgments and
executed settlements become payable, without regard to
claim reserves previously established, date of incident, date
of claim demand or date suit was filed. If final judgments,

10

which are entered simultaneously, exceed the Plan's limit of liability, the Plan's limit of liability shall be apportioned pro rata to those simultaneous judgments. Any deficiency in Plan Funds, which would not permit full payment of any claim or suit judgment, shall not impose any liability on the Employer.

## ARTICLE IX

## **Limit of Liability**

1.    Except as provided in paragraphs 2, 3 and 4 of this Article, the University shall not pay from Plan Funds more than five million dollars ($5,000,000) as damages for all covered claims or suits:

    A.    that result from one Occurrence, or

    B.    that result from the rendering of or failure to render a University Service to any one person or organization.

This is the maximum amount, which the University will pay regardless of the number of covered persons, claims made or suits brought, or persons or organizations making claims or bringing suits.

2.    For medical professionals, the maximum amount payable from Plan Funds will be any applicable medical professional liability self-insured retention under any program of excess insurance purchased by the University as damages for all covered claims or suits:

11

    A.    that result from one Occurrence, or

    B.    that result from the rendering of or failure to render a University Service to any one person or organization.

This is the maximum amount, which the University will pay regardless of the number of covered persons, claims made or suits brought, or persons or organizations making claims or bringing suits.

3.    The Plan's Limit of Liability for each claim made or suit brought before July 1, 1992, shall be the balance of the Plan Funds at the time of execution of settlement or entry of final judgment less obligations of the Funds incurred through settlements previously executed and final judgments previously entered.

4.    Notwithstanding paragraphs 1, 2 and 3 of this Article, the Limit of Liability shall not exceed any constitutional, statutory or other legal limitation imposed upon the University in the payment of funds for such purposes. The Plan's Limit of Liability shall not in any case exceed the balance of the applicable Plan Funds at the time of execution of settlement or entry of final judgment, less obligations of the Funds incurred through settlements previously executed and final judgments previously entered.

ARTICLE X

**Plan Funding**

The Plan will be financed under the following guidelines:

1.  The funding of the Plan shall be determined by the Vice President with the advice of an independent actuary contracted by the Employer.

2.  The Vice President shall ascertain appropriate funding levels for the payment of actuarially projected costs of claims and expenses of the Plan, including the costs of administration, claims adjustment, the purchase of commercial insurance and legal defense.

3.  The Vice President shall inform The Board of the recommended level of funding, as determined above, and shall transfer the proper amounts to accounts or Plan Funds.

4.  The Vice President shall assess University units on an equitable basis for contributions to the Plan Funds.

ARTICLE XI

**Fund**

1.  The Plan Fund(s) or accounts shall exist as long as any claim or expense payable under the Plan, or any amendments adopted thereto prior to its termination, is outstanding and may become payable from said Fund(s).  The money deposited in the Plan Fund(s) shall be used solely for the purpose of payment of such claims and expenses and shall not be subject to diversion for any other purpose so long as the Plan shall be in effect.

13

2.   The Plan Fund(s) shall be the sole source of all payments made pursuant to the Plan and in no circumstance shall any other funds of the Employer, any Officer or Member of The Board of Trustees individually, any Employee or any other Covered Person be liable or responsible for payment of any Plan obligation.

## ARTICLE XII

### Miscellaneous Provisions

1.   **Covered Person's Duties in the Event of Occurrence, Claim or Suit**

A Covered Person shall submit to the University Counsel or designee at the earliest reasonable time following an occurrence, statement, act or omission which might result in a claim under the Plan, a written notice containing particulars sufficient to identify injured person(s), covered persons, witnesses and the time, place and circumstances of occurrence or University service.

If claim is made or suit is brought against a Covered Person, the Covered Person shall, not later than 15 days after receipt, forward to the University Counsel every demand, notice, summons or other process received by him or his representative.

The Covered Person shall cooperate with the Employer and, upon the Employer's request, assist in making settlements, conducting suits and enforcing any right of contribution or indemnity against any person or organization who may be liable to the Covered Person because of injury or damage with respect to which coverage is afforded under the Plan; and the Coverage

14

Person shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The Covered Person shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense.

Failure of the Covered Person to cooperate with the Employer or give any notice required under the Plan or deliver summons and complaint to the University Counsel not later than 15 days after service of process shall constitute a waiver of the coverage provisions provided by the Plan.

2.    **Action Against Employer Under the Plan**

No action shall be brought or maintained against the Employer under the Plan unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of the Plan, nor until the amount of the Plan's obligation to pay shall have been finally determined either by final judgment against the Covered Person or by written agreement of the Employer and the Claimant.

No person or organization shall have any right under the Plan to join the Employer as a party to any action against the Covered Person to determine the Covered Person's liability, nor shall the Employer be impleaded by the Covered Person or his legal representative. Nothing in the Plan shall be construed as a waiver of any governmental immunity or legal remedy or defense of the University, any Officer or Member of The Board, Employee or Student of the University.

3.    **Other Insurance Purchased by Employer**

The coverage afforded by the Plan shall apply in excess of other valid and collectible insurance purchased by the Employer.

15

4.    **Subrogation**

In the Event of any payment under the Plan, the Employer shall be subrogated to all the Covered Person's rights of recovery therefore against any person or organization and the Covered Person shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The covered person shall do nothing to prejudice such rights.

5.    **Changes in the Plan**

All amendments to the Plan subsequent to the date of first approval of the Plan by The Board of Trustees shall be prepared by the Vice President and subject to approval as to legal form by the University Counsel. The Vice President will submit the proposed amendments to the President of the University for review and recommendation to The Board of Trustees. Amendments adopted by The Board shall become effective on the date fixed by The Board of Trustees, without notice to Covered Persons. The Plan and all amendments thereto shall be available for inspection at reasonable times in the office of the Secretary of the Board, and information regarding the Plan shall be distributed through campus publications.

6.    **Assignment**

The interest hereunder of any Covered Person is not assignable. If the Covered Person shall die or be adjudged incompetent, this coverage shall thereupon terminate, but shall cover the Covered Person's legal representative as the Covered Person with respect to damages previously incurred and to which this Plan applies.

16

7.    **Cancellation**

The Board may at anytime terminate the Plan and cancel the coverage provided therein. Notice of such termination of the Plan and cancellation of coverage will be given to all Covered Persons by publication in a newspaper of general circulation in Cook County and a newspaper of general circulation in Champaign County, Illinois, at least 30 days prior to the effective date of such termination and cancellation.

8.    **Plan Severability**

In the event that any part of the Plan is held to be unconstitutional or otherwise declared illegal or invalid, the other part of the Plan will remain in full force and effect, subject to Board action.

9.    **Applicability of Coverage**

The Vice President with the advice of the University Counsel shall decide questions regarding coverage or interpretation of the Plan.

17

University departments may request additional copies of
this document by calling:

**University Office of Risk Management**
(217) 333-3113